# WATER POWER COMPANY, INC., et al,
*Appellants,*

*v.*

# PACIFICORP,
## dba PACIFIC POWER & LIGHT CO.,
*Respondent,*

*v.*

# DOUGLAS ELECTRIC COOPERATIVE,
*Respondent.*

## (8607-04185; CA A46977)

781 P2d 860

Arden E. Shenker, Portland, argued the cause for appellants. With him on the briefs were Robert E. L. Bonaparte and Tooze Marshall Shenker Holloway & Duden, Portland.

Stephen S. Walters, Portland, argued the cause for respondent PacifiCorp. With him on the brief were Charles F. Adams and Stoel Rives Boley Jones & Grey, Portland.

No appearance for respondent Douglas Electric Cooperative.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

NEWMAN, J.

## NEWMAN, J.

Plaintiffs (Water Power) appeal a judgment for defendant (Pacific) in an action for damages for breach of an electric power purchase agreement.[1] The jury returned a general verdict for Pacific. Water Power makes ten assignments of error challenging the court's giving or refusing to give instructions, its ruling that the Public Utility Commission (PUC) had primary jurisdiction and certain rulings on evidence and damages. We affirm.

The jury could have found that Water Power, a small power producer, wished to build a project on Mill Creek in Douglas County and generate, sell and deliver power to Pacific, a regulated utility. Water Power commenced negotiations with Pacific in late 1982. Pacific notified Water Power, whose production facilities were not connected to Pacific's electric power grid,[2] that, before it would execute a power purchase agreement, it would require a "wheeling" or transmission agreement that would detail how Water Power would send power from Mill Creek to Pacific's grid.

Pacific buys power according to an avoided cost schedule that is subject to approval by PUC.[3] In August, 1983, PUC approved a new schedule with lower rates than the 1982 schedule. Pacific notified Water Power that a power purchase agreement executed after September 30, 1983, would use the lower rates.

Water Power could deliver its power to Pacific at several locations, including Cottage Grove, in Lane County, and Fairview, in Coos County. In either case, Water Power would have to send its power over lines of the Bonneville

---

[1] Water Power asked, in the alternative, for injunctive relief. The court dismissed that claim, and that action is not included in this appeal.

[2] An electric power grid is a network of conductors for the distribution of electric power.

[3] An electric utility must purchase power from a small power producer at a rate no lower than its avoided cost, that is, "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." 18 CFR § 292.101(6); *see* ORS 758.505(1). The utility is required to forecast its avoided costs every two years, and the avoided cost schedules then serve to determine purchase rates from qualifying facilities. 18 CFR § 292.302(b); ORS 758.525(1) and (2).

Power Administration (BPA) and the Douglas Electric Cooperative, Inc. (Douglas).[4] Douglas's lines run from Mill Creek to BPA's system, BPA lines connect with Pacific's grid at several points. Accordingly, it was necessary that Douglas, BPA, Water Power and Pacific all be parties to a transmission agreement. Both BPA and Douglas had expressed their willingness to do so.

To take advantage of Pacific's higher 1982 purchase rates, Water Power proposed a power purchase agreement at the 1982 rates with a provision that, unless a transmission agreement were executed by a certain date, Pacific could terminate the agreement. Pacific rejected the proposal. In October, 1983, Water Power asked PUC, as an arbitrator, *former* OAR 860-29-005(3), to decide whether Pacific was required to sign a power purchase agreement at 1982 rates. PUC ruled that Pacific had to sign a power purchase agreement at 1982 rates, if Water Power would submit a written plan for transmitting power to Pacific's grid. In December, 1983, Water Power submitted a plan to use the systems of BPA and Douglas to deliver its power to Pacific at Cottage Grove.

On June 5, 1984, Pacific expressed a willingness to execute a power purchase agreement under which Water Power would have until December 31, 1984, to obtain a transmission agreement executed by Water Power, Pacific, Douglas and BPA. Pacific and Water Power disagreed, however, about the point of delivery. Pacific wanted Cottage Grove; Water Power wanted to leave the point of delivery open. On August 17, 1984, the parties asked PUC to decide that dispute. It ruled that Pacific could require that Cottage Grove be the point of delivery, but that the deadline for completion of the transmission agreement would be November 1, 1985.

Water Power and Pacific executed the power purchase agreement on November 28, 1984, and PUC approved it. Article II of the agreement provides:

"This Agreement shall not become effective until Sellers, Utility, BPA, and Pacific have entered into the Transmission Agreement providing for firm transmission of electric power

---

[4] Pacific named Douglas as a third-party defendant but later withdrew that complaint. The judgment dismissed the complaint against Douglas.

from the Facility to Pacific's system pursuant to, and under the constraints contained in, Article IX; *provided,* that if the Transmission Agreement has not been executed by all four parties prior to November 1, 1985, or if the Transmission Agreement has not been approved by the Rural Electrification Administration prior to November 1, 1986, this Agreement shall be null and void." (Emphasis in original.)

Article I defines "Point of Delivery" as

"the location where Net Delivered Output is delivered to Pacific's system at BPA's Cottage Grove Substation, as specified in the Transmission Agreement, or at such other location as may reasonably be required by Pacific to allow Pacific to accept Net Delivered Output from BPA."

Article XVII provides, in part:

"As used in this Agreement, 'Force Majeure' means unforeseeable causes beyond the reasonable control of and without the fault or negligence of the party claiming Force Majeure."

BPA distributed a draft transmission agreement to Douglas, Pacific, and Water Power on October 10, 1984. Pacific responded with comments in June, 1985. The parties continued to disagree about the point of delivery. Water Power wanted Fairview as the primary point of delivery; Pacific wanted it only as a backup point to Cottage Grove. They referred the dispute to PUC. On October 7, 1985, PUC ruled that Pacific's position was reasonable in terms of its needs and consistent with the power purchase agreement.

On October 22, 1985, BPA circulated another draft of a transmission agreement with new provisions. Pacific telephoned BPA on October 25, hand-delivered a marked-up copy of the draft to BPA on October 28, and sent it a letter, dated October 30, discussing its concerns about the new provisions. Pacific stated that it wanted Cottage Grove as the point of delivery. The letter ended with an assurance that "Pacific is willing to discuss the resolution of these issues to achieve an acceptable agreement within the time-frame stated in the Power Purchase Agreement." BPA responded to Pacific on February 28, 1986. It rejected Cottage Grove as the point of delivery and suggested its Alvey substation instead.

On November 12, 1985, Water Power notified Pacific that it had been willing to sign the BPA draft transmission

agreement of October 21, 1985, with one change in the environmental review provision, and that the condition in the power purchase agreement that required a transmission agreement by November 1, 1985, should be excused under the force majeure article, because Water Power had no control over the other three parties. Pacific replied on December 13, 1985, that, under Article II, the power purchase agreement was null and void, because the transmission agreement had not been executed by the four parties by November 1, 1985. On July 14, 1986, Water Power brought this action.

Water Power assigns as errors that the court instructed the jury, in substance, that Pacific (1) was not required to enter into a transmission agreement that it reasonably believed was not in its best interests; and (2) had a right to insist that the transmission agreement designate Cottage Grove as the point of delivery. Water Power argues that the federal Public Utilities Regulatory Policy Act (PURPA), 16 USC § 824a-3, imposes on Pacific a statutory obligation to purchase electric power from it and that Pacific's best interests, or preference as to a delivery point, are irrelevant.

■      Water Power relies on *Snow Mt. Pine Company v. Maudlin,* 84 Or App 590, 734 P2d 1366, *rev den* 303 Or 591 (1987), and asserts that "the obligation to purchase power is imposed by law on a utility; it is not voluntarily assumed." 84 Or App at 599. In *Snow Mt. Pine,* we also said that a utility's obligation "is created by statutes, regulations and administrative rules." 84 Or App at 598. Those statutes, regulations and rules require a utility to *offer* to purchase power from a qualifying facility, which includes a small power producer. The utility, however, is not required to purchase in any and all events and may insist on provisions that require that a transmission agreement be signed by a certain date and designate a particular point of delivery.

Congress enacted PURPA in 1978, in part to encourage qualifying facilities to produce electric energy. The legislation directs the Federal Energy Regulatory Commission (FERC) to promulgate regulations to require electric utilities "to offer to * * * purchase electric energy" from qualifying facilities, 16 USC § 824a-3(a), and to ensure that the rates that the qualifying facility charges the electric utility are fair both to the qualifying facility and to the ultimate consumer. 16

USC § 824a-3(b). Other provisions of PURPA cover rates for the sale of electric energy to and from qualifying facilities, the implementation and enforcement of the regulations and several exemptions therefrom.

■    FERC has promulgated rules that implement PURPA. 18 CFR Part 292. 18 CFR § 292.301 provides:

"(a)   *Applicability.* This subpart applies to the regulation of sales and purchases between qualifying facilities and electric utilities.

"(b)   *Negotiated rates or terms.* Nothing in this subpart:

"(1)   Limits the authority of any electric utility or any qualifying facility to agree to a rate for any purchase, *or terms or conditions relating to any purchase, which differ from the rate or terms or conditions which would otherwise be required by this subpart;* or

"(2)   Affects the validity of any contract entered into between a qualifying facility and an electric utility for any purchase." (Emphasis supplied.)

PURPA also requires state regulatory agencies to enforce its provisions. 16 USC § 824a-3(f)(1). Oregon has enacted legislation governing small power producers and has administrative rules that parallel PURPA and its regulations. ORS 758.505 *et seq;* OAR 860-29-001 *et seq.*[5] Under the federal statute and regulations and the state statute and rules, therefore, the parties may agree on terms or conditions in a power purchase agreement that vary from what is set forth in the regulations

---

[5] ORS 758.515(2) states that its goal, like the goal of PURPA, is to:

"(a) Promote the development of a diverse array of permanently sustainable energy resources using the public and private sectors to the highest degree possible; and

"(b) Insure that rates for purchases by an electric utility from, and rates for sales to, a qualifying facility shall over the term of a contract be just and reasonable to the electric consumers of the electric utility, the qualifying facility and in the public interest."

PUC's rules provide:

"Nothing in these rules limits the authority of a public utility or qualifying facility to agree to a rate for any purchase, *or terms or conditions relating to any purchase, which differ from the rate or terms or conditions which would otherwise be provided by these rules,* provided such rates or terms do not burden ratepayers of the utility." OAR 860-29-005(2). (Emphasis supplied.)

Water Power does not assert that it has any greater rights under the state statute and rules than under PURPA and its regulations.

and rules.[6] It follows that the parties may also make contractual provisions on matters that the regulations and rules do not cover.

■ Nothing in *Snow Mt. Pine* is to the contrary. There the issues were *when* a utility's obligation to purchase power arises and *what* purchase rates apply, matters that the regulations and rules covered. The statutes, regulations and rules, on the other hand, do not cover the location of points of delivery or deadlines for transmission agreements. Accordingly, the power purchase agreement could provide for Cottage Grove as the point of delivery and a November 1, 1985, deadline for execution of the transmission agreement. The challenged jury instructions are consistent with our conclusion and giving them was not erroneous.

■ Water Power also assigns as errors that the court instructed the jury that (1) it must find for Pacific if, irrespective of its motives and actions, no transmission agreement would have been executed by November 1, 1985, and (2) Water Power had the burden of proving that Pacific deliberately refused to enter into a transmission agreement for the *sole* purpose of voiding the power purchase agreement. From the evidence, the jury could have found that, independently of any actions, motives or purposes of Pacific, BPA refused to sign a transmission agreement that designated Cottage Grove as the delivery point either by November 1, 1985, or after that date. Pacific's motives, actions, purposes or sole purpose in not signing the transmission agreement by November 1, 1985, are, therefore, irrelevant in view of BPA's refusal to sign. The instruction respecting Pacific's motives and actions was not erroneous. The instruction respecting Water Power's burden of proof as to Pacific's purpose, if it was error as to any party, was harmless as to Water Power.

■ Water Power assigns as error that the court refused to give plaintiffs' requested force majeure instruction. Article II of the power purchase agreement, however, contemplates the possibility that the transmission agreement would not be

---

[6] FERC's comments confirm that the regulation conforms to PURPA. "Agreements between an electric utility and a * * * small power producer for purchases * * * under terms or conditions different from those set forth in these rules, do not violate the Commission's rules under section 210 of PURPA." 45 Fed Reg 12217.

executed by the four parties by November 1, 1985, and provides that, in that event, the agreement is null and void. Failure to sign a transmission agreement before that date was not "unforeseeable" within the meaning of Article XVII. The court did not err in refusing that instruction.

■ The court also did not err when it refused to give Water Power's requested instructions relating to statutory treble damages. *See former* ORS 756.185.[7] Water Power was not entitled to treble damages unless the jury had awarded Water Power general damages. The jury awarded no damages. The court's failure to give the requested instruction, even assuming that was error, was harmless.

■ We interpret two additional assignments of error to be that the court erred when it refused to allow the jury to consider as part of Water Power's damages an item described in the testimony of Wolverton, one of Water Power's witnesses,[8] and when it refused to submit to the jury Water

---

[7] *Former* ORS 756.185 (since amended to include telecommunications utilities but otherwise identical) provides:

"(1) Any public utility, railroad, air carrier or motor carrier which does, or causes or permits to be done, any matter, act or thing prohibited by ORS chapter 756, 757, 758, 760, 761, 763, 764, 767 or 773 or omits to do any act, matter or thing required to be done by such statutes, is liable to the person injured thereby in the amount of damages sustained in consequence of such violation. If the party seeking damages alleges and proves that the wrong or omission was the result of gross negligence or wilful misconduct, the public utility, railroad, air carrier or motor carrier is liable to the person injured thereby in treble the amount of damages sustained in consequence of the violation. If damages are awarded, the court may also fix and award reasonable attorney fees at trial and on appeal."

[8] Water Power's assignment of error regarding Mr. Wolverton reads:

"The trial court erred in allowing defendant's motion for a directed verdict on the question of damages with respect to Mr. Wolverton's testimony:

" 'At the end of the plaintiffs' case, I allowed the defendant's motion for a directed verdict on the question of damages with respect to the damages testified by Mr. Wolverton of somewheres between $8.2 and $14.2 million. The basis of that ruling was that Mr. Wolverton's entire testimony—and this becomes even clearer even though when you examine Exhibit 472, which is not part of the record but which was his report, and I assume if asked the right questions would answer as to the matter in his report that if the damages which he was referring to were the damages that would be the lost profits that would be received by the investors in this project as limited partners are not necessarily the damages of Water Power Company, Inc. or Mr. Baker.

" 'Upon further—as I understand Mr. Wolverton's basic testimony, though, and the intention of the party—of the plaintiffs was to create a partnership in which Water Power Company, Inc., someone was going to be a general partner and they would sell limited partnership interest.' "

Power's requested instructions respecting those "damages." Wolverton testified that Water Power, as general partner, planned to form a limited partnership to operate the Mill Creek facility. Wolverton testified that the limited partners would lose profits if Pacific succeeded in voiding the power purchase agreement. Water Power asked that the jury consider those lost profits as an item of damages. The persons who would have been limited partners, however, are not parties to this action, and any loss of profits that they might have suffered because Pacific terminated the power purchase agreement could not be damages to Water Power. The assignments of error are without merit.

Finally, Water Power assigns as errors several of the court's rulings excluding evidence. It offered the testimony of a former BPA employe about conversations with other BPA employes concerning Pacific's motives in refusing to change the point of delivery from Cottage Grove. The court excluded it. We have already decided that Pacific had a right to insist on Cottage Grove as a point of delivery and that its motives are irrelevant.

Although the court admitted in evidence a letter from Water Power's attorney to Pacific's attorney, dated December 23, 1985, it excluded two affidavits and notes of a meeting on the transmission agreement that were attached to the letter. Water Power urged the court to admit the material on the ground that it provided a context for the letter. The court also refused to admit two letters, dated September 18 and 19, 1986, one from a Pacific employe and one from a BPA employe, discussing the timing of separating certain Pacific and Emerald People's Utility District systems. In each instance, the court did not abuse its discretion.

The court also refused to admit testimony of Water Power's employe about negotiations that he had with a vice-president of Pacific in March, 1986. The employe would have testified that Pacific's officer proposed that the parties transmit power to Fairview by an alternate transmission line. Even assuming that the testimony would not have been inadmissible under OEC 408,[9] the court did not abuse its discretion in

[9] OEC 408 provides:

"(1)(a) Evidence of furnishing or offering or promising to furnish, or accept-

excluding it.[10]

Affirmed.

---

ing or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

"(b) Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

"(2)(a) Subsection (1) of this section does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations."

[10] Water Power also assigns error to the court's statement that PUC had primary jurisdiction, but it acknowledges that its assignment asserts no reversible error and should be considered only in the event of a retrial. It is unnecessary, therefore, to consider it.