Argued and submitted June 27, 1986, affirmed in part, reversed and remanded
in part April 8, reconsideration denied June 12, petition for review denied July 8, 1987
(303 Or 591)

# SNOW MOUNTAIN PINE COMPANY,
*Respondent,*

*v.*

# MAUDLIN,
*Appellant,*

*and*

# CP NATIONAL CORPORATION,
*Appellant,*

*and*

# IDAHO POWER COMPANY,
*Respondent below.*

(A8501-00567; CA A37762)

734 P2d 1366

W. Benny Won, Assistant Attorney General, Salem, argued the cause for appellant Gene Maudlin, Public Utility Commissioner. With him on the briefs were Dave Frohnmayer, Attorney General, James E. Mountain, Jr., Solicitor General, and Thomas E. Twist, Assistant Attorney General, Salem.

Jeffrey M. Batchelor, Portland, argued the cause for appellant CP National Corporation. With him on the briefs were John W. Gould, Marvin D. Fjordbeck and Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland.

Donald A. Haagensen, Portland, argued the cause for respondent Snow Mountain Pine Company. With him on the brief were Paul E. Levy, Spokane, Washington, Mildred J. Carmack and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Before Buttler, Presiding Judge, and Richardson and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Snow Mountain filed a complaint with the Public Utility Commissioner asking the commissioner to compel CP National Corporation (CP), a regulated nongenerating electric power distributor, to purchase power from Snow Mountain Pine Company (Snow Mountain), a qualifying cogeneration facility, and to determine the rate to be paid for the power so purchased. The commissioner ordered CP to purchase power, approved a contract and set the purchase rate at CP's "avoided cost" on file with the commissioner at the time of the publication of his order, September, 1984.[1]

The circuit court affirmed the commissioner's order requiring CP to purchase power from Snow Mountain but held that the commissioner had used the wrong "avoided cost" schedule to determine the price. It reversed the commissioner in part and remanded for the preparation of a contract reflecting a rate based on the "avoided cost" schedule on file in July, 1983. Both CP and the commissioner appeal the circuit court's order.[2]

We review the commissioner's order under ORS 756.594 and ORS 756.598(1) and may disturb it only if it is not supported by substantial evidence or is unreasonable or unlawful. *Market Transport v. Maudlin,* 301 Or 727, 725 P2d 914 (1986).

Cogeneration facilities simultaneously produce two forms of useful energy, such as electric power and steam. They use significantly less fuel to produce the two types of energy together than would be required to produce the two types separately. *See* 45 Fed Reg 12215 (1980). To encourage the conservation of oil and gas by electric utilities, Congress enacted section 210 of the Public Utility Regulatory Policies Act of 1978, 16 USC § 824a-3 (PURPA). *FERC v. Mississippi,* 456 US 742, 750, 102 S Ct 2126, 72 L Ed 2d 532 (1982). That

---

[1] The commissioner issued two orders. The first, PUC Order No. 84-263, resolved the question of CP's obligation to purchase power, but did not decide the rate. The second, PUC Order No. 84-895, decided that the rate should be based on the "avoided costs" on file as of September, 1984.

[2] Idaho Power was dismissed from the case by the circuit court; however, the commissioner's notice of appeal lists Idaho Power as an adverse party. Because the commissioner's brief states that Idaho Power is not a party to the appeal, and it has not appeared, we dismiss the appeal as to it.

section requires the Federal Energy Regulatory Commission (FERC) to prescribe rules to encourage cogeneration and small power production. FERC's rules require electric utilities to offer to purchase electric energy from "qualifying energy facilities." 16 USC § 824a-3(a).

State regulatory authorities are required to implement FERC's regulations within one year after they are promulgated. 16 USC § 824a-3(f)(1). Oregon has enacted legislation that closely parallels the federal statute, and the commissioner has, in turn, prescribed administrative rules, which, with a few exceptions, are substantively the same as the federal regulations.

ORS 758.505(2)(a) defines a "cogeneration facility" as a facility that

"[p]roduces, through the sequential use of energy, electric energy and useful thermal energy including but not limited to heat or steam, used for industrial, commercial, heating or cooling purposes."

A cogeneration facility is a "qualifying facility" as defined by PURPA rules and Oregon law. 18 CFR § 292.101(b)(1); ORS 758.525(8).

ORS 758.515 states the legislature's goals and policies with respect to the encouragement of qualifying facilities:

"(1) The State of Oregon has abundant renewable resources.

"(2) It is the goal of Oregon to:

"(a) Promote the development of a diverse array of permanently sustainable energy resources using the public and private sectors to the highest degree possible; and

"(b) Insure that rates for purchases by an electric utility from, and rates for sales to, a qualifying facility shall over the term of a contract be just and reasonable to the electric consumers of the electric utility, the qualifying facility and in the public interest.

"(3) It is, therefore, the policy of the State of Oregon to:

"(a) Increase the marketability of electric energy produced by qualifying facilities located throughout the state for the benefit of Oregon's citizens; and

"(b) Create a settled and uniform institutional climate for the qualifying facilities in Oregon."

Electric utilities are required to purchase all energy made available by a qualifying facility at a price sufficient to encourage the production of energy. 18 CFR § 292.303(a); ORS 758.525(2); OAR 860-29-030(1).[3] Although an electric utility and a qualifying facility are free to negotiate the rate and terms of any purchase, 18 CFR § 292.301(b)(1); OAR 860-29-005(2), the price paid must not be less than the utility's "avoided costs." ORS 758.525(2).[4] "Avoided costs" are defined in ORS 758.505(1) as

> "the incremental costs to an electric utility of electric energy or energy and capacity that the utility would generate itself or purchase from another source but for the purchase from a qualifying facility."

A utility is required regularly to provide "[s]ufficient data concerning its avoided costs * * * to allow the owner or operator of the qualifying facility to estimate, with reasonable accuracy, the payment it would receive from the utility" for power. OAR 860-29-080(1). In addition, at least every two years, utilities must file a schedule of avoided costs in a forecast covering at least the next 20 years. The schedules are reviewed and approved by the commissioner. ORS 758.525(1).

If a qualifying facility elects to provide power pursuant to a "legally enforceable obligation," the facility may choose to have the purchase price based on the utility's

---

[3] OAR 860-29-030(1) provides:

"(1) Obligations to purchase from qualifying facilities: Each electric utility shall purchase, in accordance with OAR 860-29-040, any energy and capacity in excess of station service (power necessary to produce generation) and amounts attributable to conversion losses, which is made available from a qualifying facility:

"(a) Directly from a qualifying facility in its service territory; or

"(b) Indirectly from a qualifying facility in accordance with section (4) of this rule."

[4] ORS 758.525(2) provides:

"An electric utility shall offer to purchase energy or energy and capacity whether delivered directly or indirectly from a qualifying facility. Except as provided in subsection (3) of this section, the price for such a purchase shall not be less than the utility's avoided costs. At the option of the qualifying facility, exercised before beginning delivery of the energy or energy and capacity, such prices may be based on:

"(a) The avoided costs calculated at the time of delivery; or

"(b) The projected avoided costs calculated at the time the legal obligation to purchase the energy or energy and capacity is incurred."

"avoided costs" calculated at the time of delivery, or the "avoided costs" projected to apply over the life of the obligation, as calculated "at the time the obligation is incurred." ORS 758.525(2); OAR 860-29-040(4)(b).[5] Snow Mountain has chosen the latter method.

[5] OAR 860-29-040 provides, in part:

"(1) Rates for purchases by electric utilities shall:

"(a) Be just and reasonable to the ratepayers of the electric utility and in the public interest; and

"(b) Be in accordance with this section, regardless of whether the electric utility making such purchases is simultaneously making sales to the qualifying facility.

"(2) Nothing in this Division authorizes any electric utility to pay more than its avoided costs for purchases unless expressly allowed by these rules or by the Commissioner.

"(3) Establishing rates:

"(a) Except for qualifying facilities in existence prior to November, 1978, a rate for purchases satisfies the requirements of section (1) of this rule if the rate equals the avoided costs or base rate, whichever is higher, and determined after consideration of the factors set forth in section (6) of this rule.

"(b) When the rates for purchases are based upon estimates of avoided costs over a specific term of the contract or other legally enforceable obligation, the rates do not violate these rules if any payment under the obligation differs from avoided costs.

"(c) Nothing in these rules shall be construed as requiring payment of avoided-cost prices to qualifying facilities in existence prior to November, 1978; provided, however, that prices for such purchases shall be sufficient to encourage continued power production.

"(4) Rates for purchases — time of calculation. Except for the purchases made under section (5) of this rule, standard rates, each qualifying facility shall have the option to:

"(a) Provide non-firm energy as the qualifying facility determines such energy to be available for such purchases, in which case the rates for such purchases shall be based on the purchasing utility's avoided non-firm energy avoided cost or base rate in effect when the energy is delivered; or

"(b) Provide firm energy and/or capacity pursuant to a legally enforceable obligation for the delivery of energy and/or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on:

"(A) The avoided costs calculated at the time of delivery; or

"(B) The avoided costs projected to apply over the life of the obligation as calculated at the time the obligation is incurred; or

"(i) The base rate in effect at the time of initial delivery; or

"(ii) The base rate in effect when the obligation is incurred.

"* * * * *

"(6) Factors affecting rates for purchases: In determining avoided costs and for determining base rate the following factors shall, to the extent practicable, be taken into account:

"(a) The data provided pursuant to OAR 860-29-080(2) and the Commis-

The commissioner's order describes the course of negotiations between Snow Mountain and CP, which began in earnest in May, 1983, and continued until September, 1983. The parties discussed the quantity of power and the rate at which it would be purchased. They considered various rates, including those based on CP's August, 1982, February, 1983, and September, 1983, "avoided cost" schedules on file with the commissioner. Snow Mountain favored use of the earlier "avoided cost" schedules, which reflected a higher rate. The parties agree that on July 6, 1983, officials of Snow Mountain presented CP with a contract in which Snow Mountain agreed to deliver power to CP over a period of years at rates based on the August, 1982, "avoided cost" schedule on file with the commissioner. CP's representative told Snow Mountain that CP would agree to the August, 1982, rate only if the commissioner would permit CP to pass the rate on to its customers. Negotiations fell through at that point.

When negotiations reached an impasse, Snow Mountain filed a complaint with the commissioner, pursuant to

---

sioner's evaluation of the data;

"(b) The availability of capacity or energy from a qualifying facility during the system daily and seasonal peak periods, including:

"(A) The ability of the utility to dispatch output of the qualifying facility;

"(B) The expected or demonstrated reliability of the qualifying facility;

"(C) The terms of any contract or other legally enforceable obligation;

"(D) The extent to which scheduled outages of the qualifying facility can be usefully coordinated with scheduled outages of the utility's facilities;

"(E) The usefulness of energy and/or capacity supplied from a qualifying facility during system emergencies, including its ability to separate its load from its generation;

"(F) The individual and aggregate value of energy and capacity from qualifying facilities on the electric utility's system; and

"(G) The smaller capacity increments and the shorter lead times available, if any, with additions of capacity from qualifying facilities.

"(c) The relationship of the availability of energy and/or capacity from the qualifying facility as derived in subsection (6)(b) of this rule, to the ability of the electric utility to avoid costs, including the deferral of capacity additions and the reduction of fossil fuel use; and

"(d) The costs or savings resulting from variations in line losses from those that would have existed in the absence of purchases from a qualifying facility if the purchasing electric utility generated an equivalent amount of energy itself or purchased an equivalent amount of energy and/or capacity."

OAR 860-29-005.[6] The commissioner determined that CP had an obligation to purchase power from Snow Mountain. In a second order, he held that CP had incurred that obligation at the time of the publication of the commissioner's second order, which decided that the rate for the purchase should be determined on the basis of CP's most recent "avoided cost" schedule on file. The circuit court held that CP's obligation to purchase power arose in July, 1983, when Snow Mountain tendered a contract to provide power,[7] and that the "avoided cost" schedule on file at the time of the tender was the proper schedule to be used in determining the purchase rate.

The dispute now concerns only the rate to be paid for the power; the answer depends on the resolution of two questions: (1) when the obligation to purchase power was incurred and (2) whether the "avoided cost" schedules filed by CP are binding for the purpose of settling the purchase price or whether actual "avoided costs" must be used.

CP contends that, for purposes of determining the time for calculation of a utility's "avoided costs," an obligation to purchase power is incurred only when the utility and a qualifying facility execute a written contract for the purchase of power or when the commissioner issues an order determining the contract terms for the parties in a case brought before him pursuant to OAR 860-29-005(3). It asserts that an obligation is not incurred by a qualifying facility's unilateral presentation of a contract, the terms of which have not been agreed upon.

■ CP's obligation is not governed by common law concepts of contract law; it is created by statutes, regulations and administrative rules. ORS 758.525 requires a utility to purchase power from a qualifying facility. Similarly, 18 CFR 292.303(a) and OAR 860-29-030 provide that an electric utility "shall purchase" any energy and capacity "which is made

---

[6] OAR 860-29-005(3) provides:

"In the event of an impasse in negotiations between an electric utility and a qualifying facility, either party may request a determination by the commissioner of the matter at issue."

[7] The circuit court also held that the obligation was incurred at that point, because of the operation of promissory estoppel. Because we agree with the court's analysis on the effect of the tender of the contract, we do not address the question of promissory estoppel.

available from a qualifying facility." Thus, the obligation to purchase power is imposed by law on a utility; it is not voluntarily assumed.

■     ORS 758.525 allows a qualifying facility to choose to have the purchase price calculated on the basis of avoided costs calculated *at the time the legal obligation to purchase energy is incurred.* The regulations and administrative rules explain the emphasized language. A qualifying facility has the option either to provide energy "as available," 18 CFR § 292.304(d)(1); OAR 860-29-040(4)(a), or to provide it "pursuant to a legally enforceable obligation." 18 CFR 292.304(d)(2); OAR 860-29-040(4)(b). If, as here, the latter option is chosen, the qualifying facility may, again at its option, base the purchase rate on the utility's "avoided costs calculated at the time the obligation is incurred." 18 CFR 292.304(d)(2)(ii); OAR 860-29-040(4)(b)(B). The "obligation" referred to for this purpose is the *qualifying facility's* obligation to *provide* energy. That conclusion is supported by the fact that OAR 860-29-010 defines the "time the obligation is incurred" as the date on which a binding obligation first exists to *deliver* energy. Thus, the regulations and administrative rules contemplate that a qualifying facility's self-imposed obligation *to deliver energy* triggers a utility's obligation *to purchase energy.* The date on which the qualifying facility obligates itself to deliver energy fixes the date on which the "avoided costs" are determined.

■     A utility's obligation to purchase is not contingent on an agreed price. The price, although subject to negotiation, 18 CFR 292.301(b); OAR 860-29-005(2), can be determined, at the election of the qualifying facility, according to the guidelines in the regulations and administrative rules. *See* 45 Fed Reg 12217 (1980). If, by the qualifying facility's choice, the rate is to be the utility's "avoided costs at the time the obligation is incurred," the fact that the price is not agreed upon when the qualifying facility obligates itself to provide power does not change the date on which the obligation is incurred or affect the date used for determining the price. If the parties are unable to agree to a price, it will be set by the commissioner pursuant to OAR 860-29-005.

■     To permit a utility to delay the date to be used to calculate the purchase price simply by refusing to purchase

energy would expose qualifying facilities to risks that we believe Congress and the Oregon Legislature intended to prevent. The FERC commentary to 18 CFR § 292.304(d)(2) suggests that a utility cannot "merely by refusing to enter into a contract," deprive a qualifying facility of its right to commit to sell power in the future at prices which are determined at the time the qualifying facility makes its decision to provide power:

> "[18 CFR § 292.304(d)(2)] permits a qualifying facility to enter into a contract or other legally enforceable obligation to provide energy or capacity over a specified term. Use of the term 'legally enforceable obligation' is intended to prevent a utility from circumventing the requirement that provides capacity credit for an eligible qualifying facility merely by refusing to enter into a contract with the qualifying facility." 45 Fed Reg 12224 (1980).

We conclude that a qualifying facility has the power to determine the date for which "avoided costs" are to be calculated by tendering an agreement that obligates it to provide power. Snow Mountain obligated itself to provide power on July 6, 1983, and that is when CP became obligated to purchase power.

■ The circuit court held that the appropriate purchase price was the rate stated in CP's "avoided cost" schedule on file with the commissioner in July, 1983. We conclude that the rate for purchase is to be based on CP's *actual* "avoided costs" and that the schedules of "avoided costs" on file do not necessarily reflect actual costs and are not binding.

Rate schedules filed with the commissioner are "forecasts," ORS 758.525(1), and "estimates" of "avoided costs." OAR 860-29-080(2)(a). They provide a starting point for calculating the rate for the purchase of energy, *see* 45 Fed Reg 1226 (1980), and are to be considered *along with the other factors listed in OAR 860-29-040(6).* OAR 860-29-040(3)(a). Some of those factors require an evaluation of the particular qualifying facility that has incurred the obligation. We conclude that the rate to be paid by a utility for power is to be based on the utility's *actual* "avoided costs" vis-a-vis the particular qualifying facility on the date the obligation is incurred, projected to apply over the life of the obligation.

CP's actual "avoided costs" may be different from the schedule of "avoided costs" on file in July, 1983.

We do not agree with the commissioner's contention that this result will "substantially undermine the commissioner's ability to protect utility ratepayers from 'unjust and unreasonable exactions.' " OAR 860-29-040(3) provides that rates based on a utility's "avoided costs" are just and reasonable to the ratepayers and in the public interest. The fact that rates are based upon estimates of "avoided costs" over a specific term of a contract or "other legally enforceable obligation" does not alter that rule. OAR 860-29-040(3)(b). Here, CP must pay for the power at a rate projected from its July, 1983, actual "avoided costs."

The part of the circuit court judgment saying that the purchase price is to be determined from the "avoided cost" schedule on file July 6, 1983, is reversed; otherwise the judgment is affirmed; the commissioner's order is reversed and remanded for a determination of CP National's actual "avoided costs" as of July 6, 1983, projected over the life of the obligation; appeal dismissed as to Idaho Power.