Argued and submitted October 15, 1998, affirmed on appeal and cross-appeal
June 21, 2000

## OREGON TRAIL ELECTRIC CONSUMERS COOPERATIVE, INC.,
an Oregon corporation,
*Appellant - Cross-Respondent,*

*v.*

## CO-GEN CO.,
an Oregon general partnership,
D.R. Johnson Lumber Co.,
an Oregon corporation,
Strawberry Mountain Power Company,
an Oregon corporation, and
Jodi Johnson Prairie Trust,
*Respondents - Cross-Appellants.*

(96-CV-0203 ST; CA A98842)

7 P3d 594

Barbee B. Lyon argued the cause for appellant - cross-respondent. With him on the briefs was Tonkon Torp LLP.

Arden E. Shenker argued the cause for respondents - cross-appellants. With him on the briefs were Robert T. Mautz and Mautz Baum & O'Hanlon LLP and Michael J. Gentry and Tooze Duden Creamer Frank & Hutchison.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

LINDER, J.

## LINDER, J.

This is a declaratory judgment action in which plaintiff, Oregon Trail Electric Consumers Cooperative, Inc. (OTECC), appeals and defendants, Co-Gen Co., *et al*[1] (Co-Gen), cross-appeal. OTECC sought a declaration that, under a 1984 contract for the purchase of electricity, the circuit court could modify the negotiated purchase price upon a finding that the price is contrary to the public interest. OTECC also sought a related "declaration" modifying the prices. To resolve the issues presented by the action, the trial court bifurcated the trial. In the first phase, the trial court would decide whether, under the contract, the negotiated price was subject to modification and, if so, whether the circuit court was the correct entity to make the modification. If both questions were answered in the affirmative, the trial court in the second phase was to determine whether the negotiated price should be modified and, if so, by how much. The trial court never reached the second phase because it concluded that the contract did not give OTECC a right to seek modification of the purchase price. The trial court therefore entered judgment for Co-Gen accordingly.

By way of appeal, cross-assignment of error, and cross-appeal, the parties raise a host of issues relating to the trial court's conclusions about the applicable law, its interpretation of the contract, its ruling on OTECC's motions to amend the complaint, and its denial of Co-Gen's motion for attorney fees. The central issue, however, is that of the contract's meaning. We begin there and turn to the other issues sequentially. On both the appeal and the cross-appeal, we affirm.

## I. BACKGROUND

The contract that is the focus of this dispute was entered into in 1984 between CP National Corporation (CP) and Prairie Wood Products (Prairie), which, respectively, are OTECC's and Co-Gen's predecessors in interest.[2] Now that

---

[1] The defendants are Co-Gen Co., D.R. Johnson Lumber Co., Strawberry Mountain Power Company, and the Jodi Johnson Prairie Trust. In this opinion, we refer to defendants collectively as Co-Gen.

[2] At trial, Co-Gen argued that CP, rather than OTECC, was the real party in interest because the contract required Co-Gen's written consent to the assignment

the contract has been assumed by OTECC and Co-Gen, it effectively provides for OTECC to purchase energy from Co-Gen through the end of 2005. The contract sets a fixed price schedule for those energy purchases. Significantly, it further provides that the contract prices "are subject to modification, to the extent the Oregon Public Utility Commissioner, or his successor, may modify the agreed payments upon a finding that such payments are contrary to public policy." The interpretation of that provision, Article IV.B of the contract, is the centerpiece of this case.

Co-Gen is a "cogeneration facility"—or "cogenerator"—as was Prairie. Cogenerators are a distinctive class of energy production facilities. As we previously have described them, cogenerators produce two forms of useful energy, such as electric power and steam. *See generally Snow Mt. Pine Company v. Maudlin*, 84 Or App 590, 593, 734 P2d 1366, *rev den* 303 Or 591 (1987), *aff'd on subsequent appeal by Snow Mountain Pine Co. v. PUC*, 102 Or App 687, 795 P2d 611, *rev den* 310 Or 612 (1990), *cert den* 499 US 961 (1991). In producing the two energy forms, cogenerators use significantly less fuel than would be required to produce the two independently. *Id.* Because of those potential fuel and energy savings, and against the backdrop of the fuel shortages and rapidly escalating energy prices that prevailed in the 1970s, section 210 of the Public Utility Regulatory Policies Act of 1978, 16 USC § 824a-3 (PURPA), was enacted to encourage the development of cogeneration facilities. *See Snow Mt. Pine Company*, 84 Or App at 593 (discussing PURPA).

██ One of the key ways in which PURPA fosters development of cogeneration facilities is by ensuring that they have a market for the energy they produce. PURPA achieves that by requiring electric utilities to purchase energy from cogenerators. *See id.* at 594 (discussing PURPA, its implementing regulations, and parallel state statutes); *FERC v. Mississippi*, 456 US 742, 750, 102 S Ct 2126, 72 L Ed 2d 532 (1982). Significantly, however, the price that the utility must pay for the energy is open to negotiation. The price must be

---

of CP's interest in the agreement, which it had not given. The trial court found that Co-Gen waived that objection "by its course of exclusive dealing with OTECC" after the Public Utility Commission approved the transfer. On appeal, Co-Gen does not challenge that determination.

"sufficient to encourage the production of energy," which, pursuant to Oregon's implementing legislation, requires the price to be not less than the purchasing utility's "avoided costs." *Snow Mt. Pine Company,* 84 Or App at 595. Avoided costs are the expenses the utility would incur to generate the same energy itself or, alternatively, what the utility would pay to buy energy from another source.[3]

■■ Under PURPA, a cogenerator can enter into a long-term contract (as well as other forms of "legally enforceable obligations") that requires the cogenerator to sell, and a utility to buy, power over the course of many years. When a cogenerator elects to do that, the cogenerator may have the price determined in one of two ways. First, the cogenerator can opt to have the purchase price calculated upon delivery of the energy to the utility. *Id.* at 595-96. Alternatively, the cogenerator may choose to have the price fixed in the contract. In that event, the price is based on a projection of avoided costs "over the life of the obligation, as calculated 'at the time the obligation is incurred.' " *Id.* If the cogenerator opts for a fixed contract price and the parties cannot agree on that price, it is set (or was set, at the time of this contract) by the Public Utility Commissioner (Commissioner). *Id.* at 599.

The parties' contract in this case arises under that regulatory scheme. As a cogeneration facility, Prairie was entitled to require CP, as an electric utility, to purchase energy from it. Prairie chose to do so pursuant to a long-term contract, one that would bind the parties for 20 years (*i.e.,* through the year 2005). In setting the purchase price, Prairie opted to contract for fixed prices, rather than for prices determined upon delivery of the energy.

When the parties' contract negotiations were underway, PURPA was relatively new, as were cogeneration energy contracts. In their negotiations, the parties disagreed about how avoided costs should be calculated. Ultimately, they used an avoided cost schedule that the Commissioner

---

[3] "Avoided costs" are defined by statute as "the incremental costs to an electric utility of electric energy or energy and capacity that the utility would generate itself or purchase from another source but for the purchase from a qualifying facility," such as a cogenerator. ORS 758.505(1).

believed at the time was correct, even though the costs in that schedule were higher than CP's actual avoided costs. For CP, that meant that the price for energy supplied by the cogenerator was more than CP was paying its current energy supplier and more than CP expected to pay in the future. That meant in turn that, if CP could not adjust its rates to pass the higher costs on to its customers, it would lose money. As at least a partial concession to using that schedule, the parties agreed to a clause providing that the agreement would not be effective until various approvals were obtained from the Commissioner, in a form satisfactory to CP. That provision was designed to ensure that CP's utility rates would be adjusted based on the price of the energy purchased under the cogeneration contract, thus shifting the cost to CP's customers.

During that same period, CP was involved in negotiations with Snow Mountain Pine Company (Snow Mountain), another cogenerator that similarly disagreed with CP as to which schedule of avoided costs should be used. The Snow Mountain contract is not directly relevant here, but what happened in connection with it provides relevant context for this case. In the Snow Mountain negotiations, the parties failed to reach agreement on the price. CP could not persuade Snow Mountain, as it had persuaded Prairie in this case, to include in the contract a provision that the price would be effective only if the Commissioner permitted CP to adjust its rates for its customers accordingly. When negotiations fell through, Snow Mountain filed a complaint with the Commissioner, seeking to have him settle the price issue. Administrative litigation, including two appeals to this court, eventually led to a determination that the parties should base the price on the lower schedule of avoided costs that CP urged should be used (*i.e.*, the same schedule that CP was unsuccessful in persuading Prairie to use in the negotiations for this contract). *See Snow Mt. Pine Company*, 84 Or App at 597-01, *aff'd on subsequent appeal by Snow Mountain Pine Co.*, 102 Or App at 689.

By then, however, this contract had been signed, had been approved by the Commissioner, and had become effective. CP bypassed the administrative remedies it could have

pursued to have the Commissioner set the price and to litigate the issue of the appropriate schedule of avoided costs. Consequently, CP—and now OTECC—was left with a valid and enforceable contract. OTECC's only remedies are those, if any, provided by the contract.

Those events were the prelude to this litigation. OTECC filed this declaratory judgment action to seek relief from what it views as the excessively high energy prices set by the contract. As the contractual basis for relief, OTECC relied on Article IV.B of the contract, which states:

> "The prices set forth in this Article are subject to modification, to the extent the Oregon Public Utility Commissioner, or his successor, may modify the agreed payments upon a finding that such payments are contrary to public policy."

OTECC specifically asked for a declaration that the energy prices set in the contract "for the years 1995 to 2005" were subject to modification as "contrary to public policy." OTECC also sought a related declaration "modifying the payments for electrical power to be consistent with public policy."

In determining the contract's meaning, the trial court first concluded that the price-modification clause was not intended to confer authority on the Commissioner to modify the contract price. Rather, it was designed only to acknowledge the parties' understanding that, to whatever extent the Commissioner's regulatory powers gave him the ability to modify those prices, the prices negotiated in the contract could change. The trial court further concluded that the Commissioner (and, likewise, any successor to the Commissioner) has no regulatory power to modify prices set by a cogeneration contract after it is approved because any such exercise of authority is incompatible with and precluded by PURPA. Thus, the trial court held that OTECC was not entitled to seek modification of the prices under the contract. As an apparent alternative or supplemental basis for its decision, the trial court further observed that OTECC might not be entitled to a modification of the purchase price in any event. The court reasoned that "public policy" encompasses more than just the price of the purchased energy but, rather, is also served by giving effect to long-term contracts providing for the purchase of cogenerated power at a fixed price. On

appeal, OTECC challenges both aspects of the trial court's decision.

## II. JURISDICTION

■■ The threshold question for the parties and the court below was one of jurisdiction. Likewise, that is a threshold question for our review on appeal. *See Greeninger v. Cromwell*, 127 Or App 435, 438, 873 P2d 377 (1994) (courts have independent responsibility to examine jurisdiction). The issue arises because of the contract's reference to the "Public Utility Commissioner, or his successor." That language immediately invites uncertainty as to whether a dispute over possible modification authority belongs in circuit court or in an administrative proceeding before the Public Utility Commission (PUC), which is the successor to the Commissioner.[4] OTECC anticipates that concern on appeal, as it did below, and asserts circuit court jurisdiction for reasons that run to the merits of OTECC's position.[5] That is, OTECC argues that the contract provides for modification, explains at some length why the parties are no longer subject to general regulatory oversight by the PUC, and contends, for several reasons, that authority to modify the contract necessarily is now vested in a circuit court.

■ The trial court, however, correctly identified a more straightforward ground for jurisdiction. It determined that, apart from whatever other remedy OTECC may be seeking, the action requires a declaration of the parties' rights under the contract, which is an issue that a circuit court has jurisdiction to decide. We agree. As we previously have held, the determination of parties' rights under a contract is a common-law issue that falls within a circuit court's general jurisdiction. *See, e.g., Reinwald v. Dept. of Employment*, 148 Or App 75, 80-81, 939 P2d 86 (1997) (agency had at most primary, but not exclusive, jurisdiction over construction of settlement agreement; because construction of contract is a

---

[4] The single Commissioner position referred to in the contract was replaced by a three-member Commission in 1985, after this agreement was reached. *See* Or Laws 1985, ch 834, § 2(1) (so providing).

[5] Co-Gen does not dispute jurisdiction and offers no response to OTECC's position, other than to respond to the merits generally.

common-law issue, jurisdiction also resided in the circuit court).[6] We therefore do not reach OTECC's other arguments in favor of jurisdiction.

## III. THE MEANING OF THE PRICE-MODIFICATION CLAUSE

 Our conclusion on jurisdiction takes us, as it did the trial court, to the issue of the proper construction of Article IV.B. The pertinent principles we follow in construing a contract are well-settled. In the absence of an ambiguity, the trial court in the first instance, and this court on appeal, determines the meaning of a contract as a matter of law. *See Eagle Industries, Inc. v. Thompson*, 321 Or 398, 405, 900 P2d 475 (1995). A contract provision is legally ambiguous if it has no definite significance or if it is capable of more than one reasonable and sensible construction in the context of the agreement as a whole. *See Heinzel v. Backstrom*, 310 Or 89, 96, 794 P2d 775 (1990); *Quality Contractors, Inc. v. Jacobson*, 139 Or App 366, 370, 911 P2d 1268, *rev den* 323 Or 691 (1996). In deciding whether an ambiguity exists, the court is not limited to mere text and context but may consider parol and other evidence. *Abercrombie v. Hayden Corp.*, 320 Or 279, 292, 883 P2d 845 (1994). Likewise, if the contract is ambiguous, the trier of fact may consider other evidence of the parties' intentions and construe the language of the agreement accordingly. *Anderson v. Divito*, 138 Or App 272, 277-78, 908 P2d 315 (1995). Where the trial court's construction of the contract depends on factual inquiries, we review the court's factual findings for "any evidence." *See Williams v.*

---

[6] *Reinwald* recognizes that, even though an agency's jurisdiction over an issue may not be exclusive, it still may be primary. 148 Or App at 80-81. That is, the agency may be entitled to decide the issue first. That principle does not apply here because, as the parties agree, neither party is presently subject to PUC regulation, at least with respect to the price paid for energy. The doctrine of primary jurisdiction "does not involve the court's jurisdiction in the strict sense * * *." *Holman Transfer Co. v. PNB Telephone Co.*, 287 Or 387, 400 n 7, 599 P2d 1115 (1979). Rather, it is "a doctrine of common law, wholly court-made, that is designed to guide a court in determining whether and when it should refrain from or postpone the exercise of its own jurisdiction so that an agency may first answer some question presented." *Perla Development Co. v. Pacificorp*, 82 Or App 50, 53 n 1, 727 P2d 149 (1986), *rev den* 303 Or 74 (1987). Where no agency has or retains jurisdiction over the dispute—as the parties agree is the case here—there is no reason for a court to "refrain" from exercising its jurisdiction.

*Wise,* 139 Or App 276, 279, 911 P2d 1261 (1996). Our review otherwise is for legal correctness, which means that we determine, as though in the first instance, how the contract should be construed. *Stevens v. Foren,* 154 Or App 52, 57, 959 P2d 1008, *rev den* 327 Or 554 (1998).[7]

 Here, to determine whether the price-modification clause of the contract is ambiguous, the trial court resorted to extrinsic evidence. The court began by observing that, "[a]t first reading, the language of Article IV.B may not seem to clearly express under what circumstances prices may be modified." The court therefore looked to the testimony of John Gould, who was CP's attorney at the time of the contract negotiations and who drafted the clause. The trial court placed particular reliance on Gould's testimony in finding that:

> "[Only] Mr. Gould * * * had any significant understanding about the intended meaning of the clause. D.R. Johnson [Prairie's Co-President] had only a vague idea about when the clause could be invoked. Nobody else had helpful recollections. Rod Johnson [Prairie's attorney] felt the clause was unenforceable under PURPA but gave no testimony about its meaning. The parties to the contract did not discuss the meaning during negotiations."

The court then reviewed Gould's testimony, in which he explained that the price-modification provision was a *"Mobile-Sierra"* clause, designed to acknowledge that "the regulator retains the right over any contract of power purchase to modify it if it is in the public interest to do so." Gould pointed to two United States Supreme Court cases as the genesis of the doctrine, in which the Court acknowledged, as

---

[7] Although OTECC first admits that "interpretation of a contract is a question of law," OTECC then asserts that we should review the facts *de novo* because "this is an equity case." OTECC makes that assertion because it "filed this suit to interpret a contract, so that the parties could perform in accordance with that interpretation." Thus, in OTECC's view, the action effectively included a claim for specific performance, even though only declaratory relief was sought. We need not decide whether OTECC's declaratory judgment action should be deemed, in part, an action for specific performance. Even if it would be correct to do so, our review of the contract interpretation issue would not be *de novo.* We rejected just such a claim in *Stevens.* There, we held that, although the action included a claim for specific performance of a contract, *de novo* review applied only if, after construing the contract, we reached the specific performance claim. *Stevens,* 154 Or App at 59 n 5. The same is true here.

Gould described it, the "innate" power of the regulator to modify rates or prices negotiated by contract. After reviewing Gould's testimony, and quoting it in part, the trial court concluded:

> "When the language of the Agreement is illuminated by the intention of the drafter, its meaning emerges. The phrase 'to the extent' is used purposefully and unambiguously. Giving the words used their ordinary and usual meaning, *Article IV.B is not a grant of new power to the Commissioner (or his successor) to modify the prices.* Rather, it is an acknowledgment that 'to the extent' the Commissioner has such authority, it may be exercised."

(Emphasis added; footnote omitted.)

██. We are uncertain from the trial court's written opinion whether the court determined on the basis of the extrinsic evidence that the clause is not ambiguous, or whether it deemed the clause ambiguous and resolved the ambiguity from extrinsic evidence of the parties' intent. Either path, however, would have led the court to the same inquiry and, given the court's factual findings, to the same conclusion. Thus, whether we look to the "circumstances under which [the contract] was made, including the situation of the subject and the parties" to determine *if* the disputed provision is ambiguous, *see Abercrombie*, 320 Or at 292 n 7 (quoting ORS 42.220), or whether we look to the extrinsic evidence to resolve any ambiguity in the disputed provision, *id.*, the result here would not change.[8] In all events, we agree with

---

[^] Although neither party discusses the point, there is a potential question whether the holding in *Abercrombie* survives *Yogman v. Parrott*, 325 Or 358, 937 P2d 1019 (1997). *Yogman* outlined the methodology used for interpreting a contract and discussed resorting to extrinsic evidence only if the text, considered in context, is ambiguous. *Id.* at 361-64. Despite the fact that *Abercrombie* had been decided only three years earlier, *Yogman* did not cite it or discuss it and, thus, neither reaffirmed it nor disavowed it.

The Court of Appeals for the Ninth Circuit, however, has declared that *Yogman* implicitly overruled *Abercrombie* and that the portion of its holding relating to the use of extrinsic evidence is a dead letter under Oregon law. *See Webb v. National Union Fire Ins. Co. of Pittsburgh*, 207 F3d 579, 581-82 (9th Cir 2000). We decline to draw the same conclusion. First, if *Abercrombie* is to be disavowed, the Oregon Supreme Court should do the disavowing. The court did not do so—at least not explicitly—in *Yogman* despite *Abercrombie's* then-recent vintage. Second, the relevant portion of *Abercrombie* appears to be based on ORS 42.220. When the Oregon Supreme Court interprets a statute, that interpretation becomes part of the statute as if it were written into the statute at the time of its enactment.

the trial court that the provision's meaning emerges from the text and the extrinsic evidence combined.

We first examine the text of the disputed provision. *See Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997) (interpretation of a contract begins with its text). The price-modification clause expressly provides that the contract prices are subject to modification, "to the extent the [Commissioner] * * * may modify the agreed payments upon a finding that such payments are contrary to public policy." The most immediate import of that language is that the parties recognized that the prices, although set by the contract, nevertheless are subject to modification "to the extent" that the Commissioner has regulatory power to modify them on public policy grounds. OTECC, however, urges a different reading. It argues that the negotiated prices are subject to modification "to the extent that the Commissioner finds that the prices are contrary to public policy." As OTECC candidly acknowledges, its reading requires restructuring the sentence. That is, we must read the phrase "to the extent" to modify the Commissioner's finding, not the Commissioner's authority, even though it does not do so by its placement in the sentence. Because OTECC's reading requires restructuring the sentence, it is not the more natural or obvious of the two. Neither, however, is it altogether implausible or unreasonable.

The trial court therefore appropriately looked to extrinsic evidence to attempt to determine if the placement of the phrase "to the extent" was purposeful and reflects the meaning that was intended. Indeed, in a context of this kind, extrinsic evidence can play a particularly valuable role. This contract involves the highly regulated utility industry. Predictably, contractual language in such specialized or highly technical areas often reflects terms of art and usages that

*Holcomb v. Sunderland*, 321 Or 99, 105, 894 P2d 457 (1995). We therefore are particularly reluctant to disregard *Abercrombie's* conclusion insofar as it reflects the requirements of that statute. Finally, we have followed *Abercrombie* and resolved cases in reliance on it. *See, e.g., Moon v. Moon*, 140 Or App 402, 407, 914 P2d 1133, *rev den* 323 Or 484 (1996); *Criterion Interests, Inc. v. The Deschutes Club*, 136 Or App 239, 245, 902 P2d 110, *on recons* 137 Or App 312, 903 P2d 421 (1995), *rev den* 322 Or 489 (1996). For all three reasons, therefore, we adhere to *Abercrombie* and our own precedents.

have particular meaning to those in the field. In fact, that is what the record reveals in this instance.

Gould, the attorney who drafted the clause, testified that the provision illustrated the so-called *"Mobile-Sierra* doctrine." That doctrine is named for two United States Supreme Court cases: *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 US 332, 76 S Ct 373, 100 L Ed 373 (1956), and *Federal Power Com'n v. Sierra Pacific Power Co.*, 350 US 348, 76 S Ct 368, 100 L Ed 388 (1956).[9] Those cases did not involve PURPA but did involve federal statutes in the energy field. A description of them provides an understanding of the utility regulatory landscape that was in place when Gould drafted and inserted the disputed clause into the contract.

In each of the *Mobile-Sierra* cases, the parties had entered into contracts setting fixed prices for the long-term sale of power. Thereafter, in each case, one of the parties to the contract applied unilaterally for a price modification under provisions that permitted the appropriate federal regulatory agency, upon application, to review prices for whether they were unjust, unreasonable, unduly discriminatory, or preferential. The Court concluded that the statutes merely described the agencies' power to review rates upon a proper request; they neither conferred on the parties a right to that review nor gave the agencies independent regulatory power to modify price on that basis. Consequently, the fact that the parties had contracted for firm prices in each case meant that they had bargained away their right to apply for modification of prices on the ground that they were unjust and unreasonable. Because of the importance of preserving the integrity of long-term utility contracts, the Court held that the agencies were required to reject the applications for modification. *See Mobile Gas Service Corp*, 350 US at 344-47; *Sierra Pacific Power Co.*, 350 US at 353-55.

In reaching that conclusion, the Court specifically contrasted the regulatory provisions for review of prices as unjust and unreasonable with other provisions that gave the agencies unilateral regulatory authority to modify prices on

---

[9] The Oregon analog to that doctrine—the *"American Can* doctrine"—also is identified by the name of its case law source: *American Can Co. v. Davis*, 28 Or App 207, 559 P2d 898 (1976), *rev den* 278 Or 393 (1977).

the ground that they were contrary to the public interest. The Court noted that, although parties who contractually agreed to a fixed purchase price were precluded from "unilaterally changing their contracts simply because it is in their private interests to do so," that fact did not deprive the regulatory agencies of their authority under the federal statutes to intervene and adjust prices that were contrary to the public interest. *Mobile Gas Service Corp*, 350 US at 344. That power, the Court observed, remained in place notwithstanding the parties' contractual agreement. *Id.* at 345; *Sierra Pacific Power Co.*, 350 US at 353.

Gould's testimony that this price-modification clause was designed to reflect the *Mobile-Sierra* doctrine, coupled with an understanding of that doctrine, "illuminates" the clause's meaning, as the trial court concluded. The contractual provision was the parties' acknowledgment that, to the extent that the Commissioner, or his successor, possessed regulatory authority to modify the negotiated price for public policy reasons, the prices, which were otherwise firm, could change. Thus, the clause was not itself a source of authority to modify the prices but served to reflect the parties' understanding that the contract did not preclude what it could not preclude—*i.e.*, a regulator's authority, if it existed, to modify the contractual price in the public interest. In light of Gould's testimony, a single, definite meaning emerges, either rendering the clause unambiguous or explaining any ambiguity latent in it.

OTECC does not take issue with the trial court's factual findings by arguing, as it would have to do, that they are not adequately supported by the evidence.[10] Without engaging our correct standard of review (*see* note 8), OTECC

---

[10] Almost in passing, OTECC asserts that extrinsic evidence should not be considered in interpreting the price-modification provision because the contract contained an integration clause. OTECC has not properly presented the point on appeal, because it does not assign error to the trial court's admission of that evidence (even though it objected to the evidence on that ground below), nor has it assigned error to the trial court's consideration of extrinsic evidence in construing the contract. The short answer to the point, however, is that the presence of an integration clause does not change what a court may consider in construing a contract. An integration clause bars changing the terms of a contract. The fact that the terms are final does not resolve what the terms mean. Extrinsic evidence therefore may be considered to determine whether a term is ambiguous even if the agreement is fully integrated, *Abercrombie*, 320 Or at 291, and even if the contract

merely asserts that Gould's understanding of the clause should be disregarded because the evidence establishes, according to OTECC, that the parties intended the contract prices to be subject to modification in the future. The trial court found as fact, however, that Prairie's representatives (its lawyer, Rod Johnson, and co-president, D.R. Johnson) had only vague ideas of what the clause would or was intended to accomplish. Although the trial court made no express findings on the point, the record also establishes that Stan Rasmussen, the executive who represented CP, understood that the contract prices *could not be* modified at all under the contract, notwithstanding the price-modification clause. The trial court concluded (and the evidence amply supports) that Gould was the only person who "had any significant understanding about the intended meaning of the clause."

In that regard, it is worth remembering that, when these parties negotiated this contract, PURPA was relatively new, and no case had determined whether state or federal regulators possessed regulatory authority to modify prices on the ground that they were contrary to public interest. Nor had the parties' attorneys previously drafted or negotiated a cogeneration contract. Uncertainty about PURPA's provisions appears to have been part of the motivation for placing the clause in the contract. Although CP (Gould's client) wanted the prices to be subject to modification, any arrangement for flexible future prices was unacceptable to Prairie. Gould added the price-modification clause in the hope that PURPA would be interpreted to authorize state regulators to modify prices if they were contrary to the public interest. As the trial court found, the attorney for Prairie had a different view: He believed that the provision would not have any force under PURPA.

Thus, although OTECC suggests that the parties had a common understanding that prices could be modified, the record generally, and the trial court's findings in particular, do not support OTECC. A more accurate description is that each side viewed the clause as acknowledging that

contains an express integration clause, *State v. Triad Mechanical, Inc.*, 144 Or App 106, 113 n 8, 925 P2d 918, *rev den* 324 Or 488 (1996).

prices could be modified if the Commissioner had the authority to modify them in the public interest (*i.e.*, under a *Mobile-Sierra* analysis). CP hoped that the clause would be enforceable, in the sense that the Commissioner could exercise such authority; Prairie expected that PURPA would preclude such authority. The parties never discussed their subjective beliefs in that regard. Instead, the record suggests that each side kept quiet, hoping that its view of the law and of the effect, if any, of the price-modification clause, eventually would prove to be correct. Unfortunately for OTECC, its prediction proved to be the wrong one, as we later discuss. Thus, OTECC's characterization of the nature of the parties' intent regarding the clause is at odds with the record and with the trial court's factual findings.

■ OTECC next argues that, if the clause is not understood to create a contractual right to a modification, apart from whatever regulatory authority the Commissioner otherwise possesses, then the clause is superfluous and adds nothing to the parties' agreement. OTECC contends that the trial court's construction of the price-modification provision thus renders it a nullity, running afoul of the rule that effect should be given to every clause of a contract if possible. *See Sizemore v. Howard*, 71 Or App 711, 715, 693 P2d 1359 (1985); ORS 42.230.

■ OTECC's argument, however, depends on its preferred interpretation of the provision—*i.e.*, that it was intended to create a contract-based right to have the prices modified independent of the Commissioner's regulatory authority, if any. As the trial court concluded, the purpose was only to acknowledge that the prices are subject to modification "to the extent" that the Commissioner (or his successor) has regulatory power to modify them upon a finding that they are contrary to public policy. The clause serves that limited purpose. Beyond that, as the trial court noted in its decision, "it is not the job of courts to rewrite contract clauses to give them vitality where none was expressed or [mutually] intended." (Footnote omitted.) *See* ORS 42.230.[11]

---

[11] ORS 42.230 provides, in part, that:

"In the construction of an instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted * * *."

OTECC also complains that the trial court's (and our) reading of the contract violates ORS 42.240, which provides that, "[i]n the construction of an instrument the intention of the parties is to be pursued if possible," and ORS 42.260, which states that "[w]hen different constructions of a provision are otherwise equally proper, that construction is to be taken which is most favorable to the party in whose favor the provision was made." Neither statutory argument is persuasive. Our interpretation of the price-modification clause, which is the same as the trial court's, comports with the parties' understanding of the agreement. Apart from concluding that the provision is a *Mobile-Sierra* one, the contract cannot be construed, pursuant to ORS 42.240, to reflect some further common intention because there was none. Similarly, ORS 42.260 does not apply because the price-modification clause does not have two or more constructions that "are otherwise equally proper."

 In determining whether the prices can be modified, then, the only remaining issue is the extent of the Commissioner's (or his successor's) regulatory authority to modify the negotiated contract prices. As the trial court concluded, it is well-settled that the state and federal regulators do not have that power. Courts uniformly have held that state regulators cannot intervene in the public interest and modify the prices fixed by a cogeneration contract because PURPA does not provide for such authority (typically termed "utility-type" regulation), and to imply that authority would undermine the long-term cogeneration contracts that Congress sought to encourage. *See, e.g., Smith Cogeneration Mgt. v. Corp. Com'n,* 863 P2d 1227, 1240 (Okla 1993) (reconsideration of long-term contracts with estimated avoided costs imposes utility-type regulation that PURPA and implementing regulations seek to prevent).[12] Thus, in sharp contrast to the regulatory statutes at issue in the *Mobile-Sierra* set of cases, PURPA precludes a regulator's exercise of post-contractual, utility-type price modification authority.

---

[12] *See also American Paper Inst. v. American Elec. Power,* 461 US 402, 414, 103 S Ct 1921, 76 L Ed 2d 22 (1981) (legislative history of PURPA confirms that Congress did not intend to impose traditional ratemaking concepts on sales by qualifying facilities to utilities); *Freehold Cogeneration v. Bd. Reg. Com'rs of N.J.,*

OTECC does not argue otherwise. OTECC contends only that PURPA permits the parties to a cogeneration contract to agree to a flexible pricing arrangement that might include the possibility of a modification of prices on whatever basis the parties may agree is acceptable, including a determination that the prices "are contrary to public policy." Co-Gen joins issue on that point, debating whether PURPA generally allows flexible contract pricing that may be adjusted during the life of an agreement or whether the only two pricing options permissible under PURPA are "to have the purchase price based on the utility's 'avoided costs' calculated at the time of delivery, or the 'avoided costs' projected to apply over the life of the obligation, *as calculated 'at the time the obligation is incurred.'* ORS 758.525(2); OAR 860-29-040(4)(b)." *Snow Mt. Pine Company,* 84 Or App at 595-96 (footnote omitted; emphasis added). We do not need to decide that question because it is germane only if we agree with OTECC's interpretation of the price-modification clause— *i.e.*, as providing for a contract-based right to modification of prices, rather than referring to the Commissioner's regulatory authority. As we have determined, the price-modification provision is a *Mobile-Sierra* clause. The flaw in this contract is that it sought to use a state regulator, exercising utility-type authority, as the mechanism for modifying the prices set by the contract. PURPA bars that. Consequently, as the trial court concluded, "the Commissioner had no post-approval authority to modify prices * * *." *A fortiori,* the trial court also had no such authority, even "if it is the successor" to the Commissioner.

In affirming the trial court on the contract interpretation issue, we are mindful of OTECC's complaint that the contract prices to which its predecessor agreed are significantly higher than they would have been if the parties had used the avoided cost schedule that Commissioner was later persuaded in the Snow Mountain litigation to endorse. As a

---

44 F3d 1178, 1192 (3d Cir), *cert den* 516 US 815 (1995) (Congress intended to exempt qualified cogenerators from state and federal utility rate regulations); *Afton Energy, Inc. v. Idaho Power Co.,* 107 Idaho 781, 693 P2d 427, 433 (1984) (subjecting contract prices to later modification based on regulatory determination that they are contrary to the public interest results in utility-type regulation, which Congress rejected in enacting PURPA).

result, OTECC's consumers appear to be paying much higher rates for their power than would otherwise have been the case.[13] That fact, however, does not give us license to rewrite the contract to impart a meaning that the parties never intended. Instead, we hold OTECC to the bargain its predecessor made and to the risk it and its predecessor took—that is, the risk that *Mobile-Sierra* utility-type regulatory authority might not apply to cogeneration contracts. OTECC (and its predecessor CP) lost that gamble.

In sum, we affirm the trial court's interpretation of Article IV.B of the contract. So interpreted, OTECC is not entitled to a modification of the prices fixed by the contract. The trial court correctly entered judgment for Co-Gen declaring that the prices could not be modified.

## IV. THE TRIAL COURT'S ALTERNATIVE RULING

In a related assignment of error, OTECC contends that the trial court erred when it set out its second alternative or supplemental reason for concluding that the price-modification clause "is unhelpful to OTECC," as the trial court put it. In that section of the trial court's opinion, the court observed that OTECC attempted to equate prices that are in excess of avoided costs with prices that are "contrary to public policy." The court reasoned, however, that "[p]ublic policy * * * is more than avoided cost" and encompasses as well "the right to a price to be fixed at the time the obligation to provide power is incurred." *See Texaco Inc. v. FERC*, 148 F3d 1091, 1095 (DC Cir 1998) (nature of public interest necessary to override a negotiated rate in a private contract is different from and significantly more particularized than the public interest that bears on other utility rate issues); *Papago Tribal Utility Authority v. FERC*, 723 F2d 950, 954 (DC Cir 1983), *cert den* 467 US 1241 (1984) (describing public interest that warrants disturbing contractually set price as "practically insurmountable"). OTECC challenges the soundness of the trial court's reasoning. OTECC also argues that the ruling was premature because the first phase of this bifurcated

---

[14] The degree to which OTECC's ratepayers are bearing that burden is unclear. The record suggests that the Bonneville Power Administration has relieved OTECC or its customers of some portion of the financial burden of this contract.

trial was limited to construing the contract and did not extend to determining whether the contract prices in fact are "contrary to public policy." We agree with the latter point. Accordingly, we do not determine whether the trial court's observation was correct because it was not necessary to the court's decision, nor is it necessary to ours on appeal.

## V. OTECC'S MOTION TO AMEND ITS COMPLAINT

■ In its final assignment of error, OTECC contends that the trial court erred in refusing to allow it to amend its complaint to include claims for rescission or reformation of the contract. Our review is for abuse of discretion. *Sullivan v. Oregon Landmark-One, Ltd.,* 122 Or App 1, 8, 856 P2d 1043 (1993); *Hall v. Fox,* 106 Or App 377, 380, 808 P2d 99 (1991). We find none.

In ruling that OTECC could not amend its complaint to add claims for rescission or reformation, the trial court cited ORCP 23 B, which provides, in part:

> "When issues not raised by the pleadings are tried *by express or implied consent of the parties,* they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues."

(Emphasis added.) Here, OTECC did not move to amend its complaint until after the trial court issued its letter opinion ruling on the merits of the case. In denying OTECC's request to amend its complaint, the trial court explained that "[n]either rescission nor reformation issues were tried expressly or impliedly" by the parties. Therefore, the court concluded, "[t]he complaint may not now be amended to include those claims." The trial court also ruled that, "to the extent [OTECC] might argue that the court has discretion to allow such amendments, exercise of that discretion is unwarranted" in this case.

In arguing that, contrary to the trial court's conclusion, claims of rescission and reformation were explicitly or implicitly tried, OTECC points only to the closing arguments

in the case. In particular, OTECC relies on Co-Gen's closing argument, in which its attorney commented that, although one of Prairie's principals in the contract negotiations (D.R. Johnson) thought that there was a remote possibility that the contract prices could be changed in the event of a natural disaster or similar catastrophe, that witness was wrong "as a matter of law." From that alone, OTECC argues that Co-Gen established that the issue of "mutual mistake" was fully tried, implicitly or expressly, and that because mutual mistake is a basis for either reformation or rescission, OTECC should have been permitted to amend its complaint to plead those claims.

OTECC is correct that "mutual mistake" can be a basis for either rescission or reformation of a contract. *See Interior Elevator Co. v. Limmeroth*, 278 Or 589, 598, 565 P2d 1074 (1977) (rescission); *Jensen v. Miller,* 280 Or 225, 228-29, 570 P2d 375 (1977) (reformation). But there are two problems with OTECC's position that the issue of the existence of a mutual mistake was fully tried. First, OTECC points to no evidence that anyone negotiating on the other side (that is, for CP) shared the same mistaken belief that prices possibly could be modified in the event of a catastrophic event. Thus, the evidence on which OTECC relies does not establish a "mutual" mistake. Even if it did, the attorney's remark was made only in passing, only in closing argument, and only in response to a question posed by the trial court. Such an isolated comment provides us with no basis to disagree with the trial court's judgment that the issue of "mutual mistake" was not explicitly or implicitly tried by consent, or otherwise to conclude that the trial court abused its discretion. *See Bidiman v. Gehrts,* 133 Or App 145, 151, 890 P2d 436, *rev den* 321 Or 512 (1995) ("A party's assertion of a 'fall back' argument in the event that the court rejects the party's initial argument is not the kind of conduct from which consent to try a theory not pled may be implied under ORCP 23 B.").

Nevertheless, OTECC relies on *Engelcke v. Stoehsler*, 273 Or 937, 544 P2d 582 (1975), for the proposition that a trial court abuses its discretion if it denies leave to amend a complaint without a showing of prejudice by the opposing party. Here, Co-Gen did not explicitly claim that it would be

prejudiced by an amendment. The problem, however, is that OTECC did not assert below that Co-Gen had to show prejudice. OTECC argued only that the issue of mutual mistake had been tried by consent. Co-Gen hardly can be faulted for not demonstrating prejudice given that OTECC moved to amend its complaint after the trial had ended and OTECC did not so much as hint to Co-Gen or to the trial court that it believed an affirmative showing of prejudice was necessary. Under the circumstances, OTECC's argument in that respect is not preserved.[14]

## VI. CO-GEN'S ATTORNEY FEE REQUEST

Having rejected OTECC's arguments, we turn to Co-Gen's cross-appeal in which it challenges the trial court's ruling on its request for attorney fees. In its answer, Co-Gen pleaded a counterclaim for attorney fees based on the assertion that OTECC's action seeking declaratory relief was "in violation of one or more orders of the Oregon Public Utility Commission." Co-Gen relied on ORS 756.185(1), which provides:

> "Any public utility which does, or causes or permits to be done, any matter, act or thing prohibited by ORS chapter 756, 757 or 758 or omits to do any act, matter or thing required to be done by such statutes, is liable to the person injured thereby in the amount of damages sustained in consequence of such violation. If the party seeking damages alleges and proves that the wrong or omission was the result of gross negligence or willful misconduct, the public utility is liable to the person injured thereby in treble the amount of damages sustained in consequence of the violation. Except as provided in subsection (2) of this section, the court may award reasonable attorney fees to the prevailing party in an action under this section."

---

[14] By disposing of OTECC's argument on that ground, our opinion should not be understood to imply agreement with OTECC's reliance on *Engelcke*. That case, which was decided before the Oregon Rules of Civil Procedure were adopted, involved a requested amendment where the issue that was the subject of the amendment had been fully tried. Assuming that the analysis in that case has any bearing under ORCP 23 B, nothing in the opinion suggests that an amendment is required in the absence of a showing of prejudice irrespective of whether the issue to be added has been fully tried.

The trial court determined that the counterclaim was "without merit" and denied Co-Gen's request for $427,952.25 in fees.

Co-Gen's argument on appeal sets forth no meaningful analysis of how, in filing this declaratory judgment proceeding to determine its rights under the contract, OTECC did anything "prohibited by ORS chapter 756, 757 or 758" or omitted to do "any act, matter or thing required to be done by such statutes." We decline to go in search of a substantive argument to support Co-Gen's position. Moreover, Co-Gen does not attempt to demonstrate that OTECC is a public utility, as ORS 756.185(1) requires.[15] Co-Gen's argument, as presented to us, has no merit.

Affirmed on appeal and cross-appeal.

---

[15] Tracing the meaning of "public utility" for purposes of the statute on which Co-Gen relies, insofar as it might include a cogeneration facility, requires a walk through a series of related and cross-referenced statutes, including ORS 756.010(6); ORS 757.005; and ORS 758.505(4), (6), and (7). For reasons bearing on the merits, OTECC carefully demonstrates in its brief why it is not a public utility subject to regulation under the PUC's regulatory scheme. Co-Gen's briefing never takes issue with OTECC's position in that regard. We decline to explore the application of ORS 756.185(1) to a cogeneration facility given Co-Gen's failure to address that predicate inquiry.