Argued and submitted July 8; affirmed on petition, cross-petition dismissed as moot August 19, 2020; petition for review denied January 21, 2021 (367 Or 496)

Skip TARR
and Ruth Tarr,
*Petitioners
Cross-Respondents,*

*v.*

MULTNOMAH COUNTY,
*Respondent,*

*and*

Masjid IBRAHIM,
Ahmed Omer, and Arshad Ashfaq,
*Respondents
Cross-Petitioners.*

Land Use Board of Appeals
2019097; A173800

473 P3d 603

Petitioners Skip and Ruth Tarr petition for judicial review, and respondents Masjid Ibrahim, Ahmed Omer, and Arshad Ashfaq (intervenors) cross-petition for review, of an order of the Land Use Board of Appeals (LUBA). That order affirmed respondent Multnomah County's decision approving intervenors' application to build a mosque on land that they own in Multnomah County. In doing so, LUBA concluded that ORS 215.441 did not preclude Multnomah County from requiring intervenors to show that their proposed mosque conformed to county compatibility standards, but that intervenors had nevertheless made that showing. On review, petitioners contend in four assignments of error that intervenors did not make that showing. Multnomah County argues that intervenors did make that showing. And intervenors argue that, although their proposed mosque meets Multnomah County's compatibility standards, ORS 215.441 precludes Multnomah County from requiring intervenors to make that showing. *Held*: ORS 215.441 does not allow a county to condition the approval of a proposed religious land use otherwise allowed in a particular zone on compliance with a compatibility standard like Multnomah County's.

Affirmed on petition; cross-petition dismissed as moot.

Gregory S. Hathaway argued the cause for petitioners-cross-respondents. Also on the briefs were Sara Brennan and Hathaway Larson LLP.

Katherine Thomas argued the cause and filed the brief for respondent.

Robert A. Koch argued the cause for respondents-cross-petitioners. Also on the brief were Tonkon Torp LLP, Wendie L. Kellington, and Kellington Law Group, PC.

Before Lagesen, Presiding Judge, and Egan, Chief Judge, and James, Judge.

LAGESEN, P. J.

Affirmed on petition; cross-petition dismissed as moot.

**LAGESEN, P. J.**

Petitioners Skip and Ruth Tarr petition for judicial review, and respondents Masjid Ibrahim, Ahmed Omer, and Arshad Ashfaq (intervenors)[1] cross-petition for review, of an order of the Land Use Board of Appeals (LUBA). In that order, LUBA affirmed respondent Multnomah County's decision approving intervenors' application to build a proposed mosque on land that they own in the Bethany area of Multnomah County. On review to determine whether LUBA's order is unlawful in substance, ORS 197.850(9)(a), we affirm LUBA's decision to affirm the county's order approving the proposed mosque, although our reasons for doing so are different from LUBA's.

Intervenors own a 2.2-acre parcel of land in the county's Multiple-Use Agriculture (MUA-20) zone. The surrounding properties, also zoned MUA-20, generally contain large single-family residences on large lots.

Single-family residences are not the only land use permitted in the MUA-20 zone. Among other uses, "Community Service Uses" are allowed as conditional uses in that zone. Multnomah County Code (MCC) 39.4320(A); MCC 39.7520(A)(1). "Community Service Uses" include "church" and "other nonresidential place of worship." MCC 39.7520(A)(1).

One of the general standards for approval for a community service use, including a place of worship, is what the parties and LUBA call the "compatibility standard." That standard, on which this dispute centers, specifies that for a community service use to be approved, it must be one that "[i]s consistent with the character of the area." MCC 39.7515(A).

Intervenors wish to use their land to construct a mosque to serve approximately 150 families living within two to three miles of the property. To that end, they applied to the county for the necessary conditional use and design review approval.

---

[1] Consistent with the requirement in ORAP 5.15(1) for designating parties in briefs, in this opinion we refer to respondents Ibrahim, Omer, and Ashfaq collectively as "intervenors," their designation below.

Petitioners live in a home next to intervenors' land. They are of the view that the proposed mosque and the traffic and other impacts likely to be associated with it are not consistent with the residential character of the area, and oppose its construction. To that end, they participated in the hearing on intervenors' application, contending that intervenors' proposal did not meet the compatibility standard contained in MCC 39.7515(A).

Intervenors responded that ORS 215.441, a state statute governing the permissible use of land for religious purposes, precluded the county from applying its compatibility standard, effectively displacing it. That statute provides:

"(1)  If a church, synagogue, temple, mosque, chapel, meeting house or other nonresidential place of worship is allowed on real property under state law and rules and local zoning ordinances and regulations, a county shall allow the reasonable use of the real property for activities customarily associated with the practices of the religious activity, including:

"(a)  Worship services.

"(b)  Religion classes.

"(c)  Weddings.

"(d)  Funerals.

"(e)  Meal programs.

"(f)  Child care, but not including private or parochial school education for prekindergarten through grade 12 or higher education.

"(g)  Providing housing or space for housing in a building or buildings that are detached from the place of worship, provided:

"(A)  At least 50 percent of the residential units provided under this paragraph are affordable to households with incomes equal to or less than 60 percent of the median family income for the county in which the real property is located;

"(B)  The real property is in an area zoned for residential use that is located within the urban growth boundary; and

"(C)   The housing or space for housing complies with applicable land use regulations and meets the standards and criteria for residential development for the underlying zone.

"(2)   A county may:

"(a)   Subject real property described in subsection (1) of this section to reasonable regulations, including site review or design review, concerning the physical characteristics of the uses authorized under subsection (1) of this section; or

"(b)   Prohibit or restrict the use of real property by a place of worship described in subsection (1) of this section if the county finds that the level of service of public facilities, including transportation, water supply, sewer and storm drain systems is not adequate to serve the place of worship described in subsection (1) of this section.

"(3)   Notwithstanding any other provision of this section, a county may allow a private or parochial school for prekindergarten through grade 12 or higher education to be sited under applicable state law and rules and local zoning ordinances and regulations.

"(4)   Housing and space for housing provided under subsection (1)(g) of this section must be subject to a covenant appurtenant that restricts the owner and each successive owner of a building or any residential unit contained in a building from selling or renting any residential unit described in subsection (1)(g)(A) of this section as housing that is not affordable to households with incomes equal to or less than 60 percent of the median family income for the county in which the real property is located for a period of 60 years from the date of the certificate of occupancy."

ORS 215.441.

Intervenors contended that, under the plain terms of the statute, a county must allow land to be used for a proposed place of worship and related activities where state law and local zoning ordinances and regulations permit the use of land for a place of worship on the land in question unless the criteria for prohibiting that use, identified in ORS 215.441(2)(b), are present. This means, according to intervenors, that the county could not prohibit the use of intervenors' land for a mosque on the ground that the

mosque and related religious activity would not be consistent with the character of the area. Alternatively, intervenors argued that the proposed mosque is consistent with the character of the area for purposes of the compatibility standard. They supported that assertion with evidence of uses on nearby properties zoned MUA-20, as well as evidence of uses in close geographic proximity to the site, including uses on differently zoned land contained within the nearby urban growth boundary (UGB).

The county hearings officer agreed with intervenors on both points. He agreed that ORS 215.441 displaced the county's compatibility standard with respect to proposed places of worship in the MUA-20 zone. He also agreed that, in all events, the proposed mosque was "consistent with the character of the area" within the meaning of MCC 39.7515(A). On the latter point, the hearings officer concluded that the proposed mosque met the compatibility standard where the pertinent "area" of consideration included only the surrounding properties zoned MUA-20 (as intervenors had viewed it) or, alternatively, a more expanded area. He reasoned:

> "In addition, the plain language of the Code does not limit the 'area' to the surrounding rural zoned properties. The site is not located in an isolated rural area. As shown in Exhibit A.22, the site is in close proximity to the UGB, which contains a variety of more intensive uses, including two schools directly south of the site and another school to the northwest."

Ultimately, the hearings officer issued an order approving the intervenors' application, subject to 27 conditions of approval, including conditions addressing parking and traffic.

Petitioners appealed to LUBA. In four assignments of error, petitioners contended that (1) the hearings officer erred in determining that ORS 215.441 barred application of the compatibility standard; (2) the hearings officer erred in two different ways in determining that the proposed mosque comported with the compatibility standard—by assessing compatibility based on an incorrect area, and by not comparing the impacts of the proposed mosque to the

impacts of single-family residences; and (3) some of the conditions of approval were not supported by substantial evidence.

LUBA sustained petitioners' first assignment of error, agreeing with them that ORS 215.441 did not displace the county's compatibility standard. LUBA nonetheless affirmed the order based on the hearings officer's alternative conclusion that the proposed mosque satisfied the compatibility standard. In so doing, LUBA rejected petitioners' argument that the hearings officer analyzed the wrong area on the merits and rejected as unpreserved their contention that the hearings officer was required to compare the impacts of the proposed mosque with the impacts of single-family residences. LUBA also rejected petitioners' substantial-evidence challenge to the conditions of approval on the merits.

Petitioners then petitioned for judicial review in this court. In four assignments of error, petitioners contend that LUBA erred in multiple respects in upholding the hearings officer's determination that the proposed mosque satisfied the compatibility standard. Intervenors and the county respond that petitioners' arguments are, in the main, not preserved and that, in all events, LUBA correctly affirmed the hearings officer's determination that the proposed mosque comports with the compatibility standard. Intervenors further contend that ORS 215.441 precludes the application of the county's compatibility standard to proposed places of worship, including their proposed mosque.[2] Intervenors argue that the hearings officer's order should be affirmed on that basis, and that LUBA erred in concluding otherwise.

We begin with the ORS 215.441 issue. We end with it too because it is dispositive: ORS 215.441 does not allow a county to condition the approval of a proposed religious land use otherwise allowed in a particular zone on compliance with a compatibility standard like the county's. For that reason, none of petitioners' claims of error—all of which are

---

[2] Although styled as a cross-petition for review, the argument presents an alternative basis for affirming LUBA's decision, and we treat it that way rather than as a separate cross-petition.

predicated on the theory that the compatibility standard applies to intervenors' application—provide a basis for displacing LUBA's ultimate decision to affirm the hearings officer's order.

We review LUBA's order to determine whether it is unlawful in substance, ORS 197.850(9)(a), and do not substitute our judgment for LUBA's as to any factual issue, ORS 197.850(8). At issue in this case is LUBA's interpretation of ORS 215.441. That is something we review "for legal error, employing the methodology described in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), and *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009)." *Central Oregon LandWatch v. Deschutes County*, 285 Or App 267, 276-77, 396 P3d 968 (2017). Our role, as always, is to determine the meaning of the provision at issue that the enacting legislature most likely intended. *State v. Robinson*, 288 Or App 194, 198-99, 406 P3d 200 (2017). We do so by examining the statutory "text, in context, and, where appropriate, legislative history and relevant canons of construction." *Chase and Chase*, 354 Or 776, 780, 323 P3d 266 (2014). In conducting that examination, we keep in mind what the legislature has told us about how it wants us to read the words it has written: "In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted[.]" ORS 174.010.

Here, the plain terms of ORS 215.441(1) and (2), in context, leave no room for the application of the county's compatibility standard—or standards like it—to proposed religious land uses where, as here, a place of worship is allowed on a particular piece of real property under state law and county zoning laws. And, even if we are wrong about that, and the statutory terms allow for reasonable debate, the legislative history of the statute shows that the point of enacting it was to displace approval standards, like the county's compatibility standard, that were making it difficult for proposed places of worship otherwise permitted to gain approval through the conditional use process due to neighborhood opposition.

We start with the words of ORS 215.441(1). They say that, if a proposed place of worship "is allowed on real property under state law and rules and local zoning ordinances and regulations," then "a county *shall allow* the reasonable use of the real property for activities customarily associated with the practices of the religious activity." ORS 215.441(1) (emphasis added). The legislature's specification that a county "shall allow" the use of property for such religious activities shows that the legislature did not intend to let counties assess whether such activities and their impacts were "consistent with the character of the area" when called upon to approve a proposed place of worship. A county "shall allow" land to be used for such activities. Period.

We next consider the words of ORS 215.441(2), and we focus on ORS 215.441(2)(b) in particular. That provision carves out an exception to the general rule set forth in ORS 215.441(1). It gives a county the discretionary authority to prohibit or restrict the use of real property for religious activities if the public service facilities serving the property are insufficient:

"A county may:

"* * * * *

"(b)   Prohibit or restrict the use of real property by a place of worship described in subsection (1) of this section if the county finds that the level of service of public facilities, including transportation, water supply, sewer and storm drain systems is not adequate to serve the place of worship described in subsection (1) of this section."

ORS 215.441(2)(b) is important to the understanding of ORS 215.441(1)'s "shall allow" rule for two reasons. First, it shows that the legislature knew how to craft an exception to that rule when it wanted one and, in particular, that it knew how to set forth the scope of any such exception. Second, absent from ORS 215.441(2) is any similar exception authorizing a county to prohibit or restrict the use of real property for religious activities that it finds it to be incompatible with the surrounding area, or otherwise inconsistent with a county's approval standards. If we were to conclude that ORS 215.441 allows a county to reject a proposed religious land use on the grounds that it is not consistent with

the character of the area or otherwise does not satisfy the county's approval standards, we would be rewriting ORS 215.441 to include an exception to the "shall allow" rule that the legislature itself did not write. But rewriting statutes "to insert what has been omitted" falls outside of "the office of the judge." ORS 174.010. For that reason, we may not do it under the cloak of interpretation. *Id*.

Concluding our investigation of the text and context of ORS 215.441(1)'s "shall allow" rule, we examine ORS 215.441(3). As intervenors note, it supplies important context for resolving the question before us. That provision states that, in determining whether to allow a parochial school at a particular site, a county remains free to apply its usual rules of approval, and not the ones contained in the balance of ORS 215.441:

> "(3)   Notwithstanding any other provision of this section, a county may allow a private or parochial school for prekindergarten through grade 12 or higher education to be sited under applicable state law and rules and local zoning ordinances and regulations."

Thus, when the legislature meant for the usual local approval standards to apply, it said so. This confirms what the plain terms of ORS 215.441(1) and (2) signal: The legislature intended to require counties to allow the reasonable use of land for customary religious activities, if the land is located in an area in which state law and local zoning law allow for a place of worship, subject to the specific exceptions set forth in the statute. In other words, when a proposed religious land use falls within the ambit of ORS 215.441(1), the legislature intended for the standard in the statute to displace local approval standards other than those contemplated by ORS 215.441.

LUBA, as noted, reached a contrary conclusion about the operation of ORS 215.441. After reviewing the text and context of ORS 215.441(2)(b), it concluded that the legislature's intentions remained opaque and turned to the statute's legislative history. Although it acknowledged that that history contained some significant gaps, it ultimately determined that the legislature did not intend to displace

a county's authority to apply approval standards like the compatibility standard.

We do not agree that the text and context of ORS 215.441(1) and (2) leave the legislature's intentions in doubt. When considered under our methodology for construing statutes, the legislature's word choices and the rule/exception structure it gave ORS 215.441 clearly signal its intentions. Nevertheless, consistent with ORS 174.020(3), we have considered the legislative history submitted by the parties with their briefs and that considered by LUBA.[3] We see nothing suggesting that the legislature intended anything other than what the plain terms of the statute indicate. On the contrary, the legislative history tends to support the conclusion that the legislature intended to displace local approval standards that were making it difficult for proposed places of worship to obtain approval based on neighbor concerns about the impacts on the neighborhood.

Senate Bill (SB) 470, the measure that became ORS 215.441,[4] was introduced by Senator Lenn Hannon at the request of John Hassen. Audio Recording, Senate Committee on Natural Resources, Agriculture, Salmon and Water, SB 470, Mar 28, 2001, at 53:30 (statement of John Hassen), https://olis.leg.state.or.us (accessed Aug 13, 2020). Hassen, a land use lawyer practicing in Medford, had represented churches that had difficulty obtaining necessary land use approvals. *Id*. at 53:30-56:44. He explained that the conditional use permitting process presented an obstacle to approval because the churches would have to prove that a proposed church would have a minimal adverse impact on the surrounding neighborhood, something that was difficult to do when neighbors objected. *Id*.; *see also* Exhibit K, Senate Committee on Natural Resources, Agriculture, Salmon and Water, SB 470, Mar 28, 2001 (memorandum

---

[3] ORS 174.020(3) states that "[a] court may limit its consideration of legislative history to the information that the parties provide to the court. A court shall give the weight to the legislative history that the court considers to be appropriate."

[4] ORS 215.441 was enacted by the 2001 legislature. 2001 Or Laws, ch 886, § 2. Although the legislature has since amended and reorganized it, the operative provisions on which our analysis turns have not been altered in any material way.

submitted by John R. Hassen, Hornecker, Cowling, Hassen & Heysell, L.L.P.).

Hassen supplied two examples to illustrate the problem that the measure was intended to address:

"Two examples will help illustrate the problem.

"1. The First Presbyterian Church of Jacksonville has 10 acres of land zoned Border Residential inside the Jacksonville City limits. In Jacksonville, churches are allowed under the conditional use permit process and must meet the minimal adverse impact standard. The property is in Phase II of Pheasant Meadows Subdivision. Phase I of said subdivision is subject to CC&Rs which provide that a church may be built in Phase II under the conditional use permit process. *** Nevertheless, some homeowners in Phase I of the subdivision, who had bought their properties subject to the CC&R provisions, objected to the new church, and the Jacksonville City Council denied the church a conditional use permit based on the failure to meet minimal adverse impact standards. This result happened despite the Church's attempts to design buildings, reduce lighting, increase parking and enhance buffering to satisfy the neighbors. At one point the City Council indicated it might approve the conditional use permit if the Church would agree not to perform weddings or funerals and other events which are part of a church's mission at the new church facility.

"2. The Church of Jesus Christ of Latter Day Saints (hereinafter 'LDS Church') applied for a conditional use permit for a church on 5.8 acres of land zoned F-5 (Farm Residential) in Jackson County. To be approved the Church had to prove it would cause no more than a minimal adverse impact on the surrounding neighborhood. There was substantial neighborhood opposition based on traffic, noise, impact on view and value of nearby properties, and other reasons. The Jackson County Hearings Officer found that the Church had not carried its burden of proof and denied the application."

Exhibit K, Senate Committee on Natural Resources, Agriculture, Salmon and Water, SB 470, Mar 28, 2001 (memorandum submitted by John R. Hassen, Hornecker, Cowling, Hassen & Heysell, L.L.P.). He explained that "[t]he purpose of SB 470 is to address the problems" he had

identified, including the problems that religious institutions were having in obtaining conditional use approvals over neighbor objections. *Id*. He explained further that the measure was "patterned, in part, after similar legislation" adopted in Massachusetts, noting that the United States Court of Appeals for the First Circuit has sustained that legislation against a First Amendment Establishment Clause challenge in *Boyajian v. Gatzunis*, 212 F3d 1 (1st Cir 2000). *Id*.

The legislative history reflects that SB 470 met with substantial opposition, and it is true that the law that the legislature ultimately enacted looked a lot different from the one that Hassen initially proposed and Hannon initially introduced.[5] But nothing in that history suggests that the statute ultimately adopted by the legislature strayed from SB 470's initial purpose of displacing the local approval standards that were impeding the ability of places of worship to use their land for customary religious activities in zones where places of worship are permissible uses. Although, at one point, one proposed version of the measure contained a provision that would have authorized a county to evaluate a proposed place of worship's adverse impacts and to deny approval in the conditional use permitting process if the county determined that there was "a significant adverse impact on the surrounding area," *see* SB 470, A-Engrossed, section 2, subsection (3) (May 21, 2001), the legislature ultimately did not enact that provision. That tends to suggest, consistent with the text of the statute that the legislature actually did enact, that the legislature did not intend to retain for counties the discretion to deny approval for a proposed place of worship based on its neighborhood impacts or

---

[5] As introduced, SB 470, section 2, provided, in relevant part:

"(2) Notwithstanding any statewide planning goals adopted under ORS chapters 195, 196 or 197 that are inconsistent with this section and except as provided in subsection (3) of this section, a local government may not prohibit or restrict the use of real property for religious or educational purposes if the real property is owned or leased by a governmental unit, a religious organization or a nonprofit educational organization.

"(3) A local government may subject real property described in subsection (2) of this section to reasonable regulations concerning the physical characteristics of the authorized uses including, but limited to, site review and design review."

perceived consistency with the character of a neighborhood in which the applicable zoning laws make places of worship and related activities allowable land uses.

In sum, we conclude that ORS 215.441 precluded the county from applying the compatibility standard to intervenors' application. This means—as petitioners properly and candidly acknowledged at oral argument—that their arguments before LUBA and us challenging the hearings officer's interpretation and application of the compatibility standard provide no basis for displacing the hearings officer's order approving intervenors' application. For these reasons, we affirm LUBA's decision to affirm the hearings officer's order.

Affirmed on petition; cross-petition dismissed as moot.