Argued and submitted October 26, 2021, affirmed January 5, 2023

PORTLAND GENERAL ELECTRIC COMPANY
and Public Utility Commission of Oregon,
*Respondents,*

*v.*

ALFALFA SOLAR I, LLC;
Dayton Solar I, LLC; Fort Rock Solar I, LLC;
Fort Rock Solar II, LLC; Fort Rock IV, LLC;
Harney Solar I, LLC; Riley Solar I, LLC;
Starvation Solar I, LLC; Tygh Valley Solar I, LLC;
and Wasco Solar I, LLC,
*Petitioners,*

*and*

NORTHWEST AND INTERMOUNTAIN
POWER PRODUCERS COALITION et al.,
*Intervenors Below.*

Public Utility Commission of Oregon
UM1931; A173197

524 P3d 124

Petitioners seek judicial review under ORS 183.482 of a final order of the Public Utilities Commission (PUC). In that order, the PUC resolved a dispute about the meaning of a provision contained in power purchase agreements (PPAs) between respondent Portland General Electric (PGE) and certain renewable energy-generating facilities. The terms of the relevant PPAs, which the PUC formally approved, provided that the facilities were entitled to a fixed rate for power purchases for a 15-year period. The PUC determined that it had jurisdiction to resolve the dispute and, further, that the 15-year period ran from the date of contract execution. Petitioner contends that those determinations are legally erroneous. *Held*: First, under the plain terms of ORS 756.500(1), the PUC had the authority to resolve PGE's complaint about the interpretation of the parties' PPAs. Additionally, the provisions of the PPA unambiguously provide that the disputed 15-year period ran from the date of contract execution. Accordingly, the PUC's determinations were not erroneous.

Affirmed.

Keil M. Mueller argued the cause for petitioners. Also on the briefs were Steven C. Berman, Gregory M. Adams, Richardson Adams, PLLC, and Stoll Stoll Berne Lokting & Shlachter PC.

Jordan R. Silk, Assistant Attorney General, argued the cause for respondent Public Utility Commission of Oregon. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Anna M. Joyce argued the cause for respondent Portland General Electric Company. Also on the brief were Jeffrey S. Lovinger, Dallas S. DeLuca, Erin N. Dawson, Anit K. Jindal, and Markowitz Herbold PC.

Irion A. Sanger, Joni L. Sliger, and Sanger Law, PC, filed the brief *amicus curiae* for Community Renewable Energy Association, Northwest & Intermountain Power Producers Coalition, and Renewable Energy Coalition.

Lisa Rackner, Shoshana Baird, and McDowell Rackner Gibson PC filed the brief *amicus curiae* for Idaho Power and PacifiCorp.

Before Mooney, Presiding Judge, and Lagesen, Chief Judge, and DeVore, Senior Judge.*

LAGESEN, C. J.

Affirmed.

––––––––––––––
* Lagesen, C. J., *vice* DeHoog, J. pro tempore.

## LAGESEN, C. J.

This proceeding arises under ORS 183.482 on a petition for judicial review of a final order of the Public Utilities Commission (PUC). In that order, the PUC resolved a dispute about the meaning of a provision contained in power purchase agreements (PPAs) between respondent Portland General Electric (PGE) and certain renewable energy-generating facilities. The terms of the relevant PPAs, which the PUC formally approved, provided that the facilities were entitled to a fixed rate for power purchases for a 15-year period. In dispute is the start of that 15-year period. Did it start on the date of contract execution or, instead, did it start on the date that a facility first delivered power for purchase under the PPA? Rejecting arguments to the contrary, the PUC determined that it had jurisdiction to resolve the dispute and, further, that the 15-year period ran from the date of contract execution. At issue before us is whether those determinations are legally correct. We conclude that they are and, accordingly, affirm.

The facts are not in dispute. Petitioners are 10 renewable energy-generating facilities. Each of them is a "qualifying facility" (QF) for purposes of the Public Utility Regulatory Policies Act (PURPA). *See* 16 USC § 824a-3. Respondent PGE is a public utility that is required by both PURPA and state law to purchase power from QFs. To that end, PGE entered into a PPA with each petitioner. The PPAs were based on a standard contract template that respondent PUC had approved.

A dispute arose between PGE and petitioners regarding the length of the term for which petitioners were entitled to receive a fixed price for power from PGE under the terms of PGE's standard PPA. To resolve that dispute, petitioners sought declaratory relief in federal court. *See Alfalfa Solar I LLC v. Portland General Electric Co.*, No 3:18-cv-40-SI, 2018 WL 2452947 (D Or May 31, 2018). Meanwhile, PGE initiated this complaint proceeding under ORS 756.500 before the PUC. The district court stayed the federal proceeding pending resolution of the PUC proceeding, concluding that the PUC, under the plain terms of ORS 756.500, had primary jurisdiction over the parties' dispute. *Alfalfa Solar I*

*LLC*, 2018 WL 2452947 at \*7. The PUC rejected petitioners' contentions that it lacked jurisdiction over the dispute over the proper interpretation of the contractual term, then concluded that the plain terms of the provision at issue meant that PGE's interpretation was the correct one. It entered a final order to that effect.

Petitioners then petitioned for judicial review under ORS 183.482. On review, they contend that the PUC erred when it concluded that it had jurisdiction to resolve the dispute. They contend further that, if the PUC had jurisdiction, its interpretation of the disputed PPA provision is erroneous. We address those arguments in turn.

*Jurisdiction.* The first issue is whether the PUC had jurisdiction over PGE's complaint regarding the proper interpretation of the PPA. PGE and the PUC point to two alternative sources of authority, each contained within ORS 756.500: ORS 756.500(1) and (5). As we explain, we agree with PGE and the PUC—and the United States District Court for the District of Oregon—that ORS 756.500(1) conferred authority on the PUC to resolve PGE's complaint. Accordingly, we do not address whether ORS 756.500(5) also gave the PUC authority over the complaint.[1]

Whether ORS 756.500(1) gave the PUC authority to resolve PGE's complaint against petitioners regarding the interpretation of the PPA is a question of statutory construction. We answer that question examining the statute's text, in context, along with any relevant legislative history that has been provided to us or that we have located on our own. *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009) (outlining statutory-construction methodology); ORS 174.020(3) ("A court may limit its consideration of legislative history to the information that the parties provide to the court.").

Here, the text of the statute is dispositive. ORS 756.500(1) spells out both who can file a complaint before the PUC, and who can be on the receiving end of a complaint before the PUC:

---

[1] Petitioners also suggest and then refute other possible sources of the PUC's authority to resolve the complaint. We do not address those either.

"Any person may file a complaint before the Public Utility Commission, or the commission may, on the commission's own initiative, file such complaint. The complaint shall be against any person whose business or activities are regulated by some one or more of the statutes, jurisdiction for the enforcement or regulation of which is conferred upon the commission. The person filing the complaint shall be known as the complainant and the person against whom the complaint is filed shall be known as the defendant."

ORS 756.500(1). For purposes of the provision, "person" is broadly defined as "includ[ing] individuals, joint ventures, partnerships, corporations and associations or their officers, employees, agents, lessees, assignees, trustees or receivers." ORS 756.010(7). A complaint

"shall state all grounds of complaint on which the complainant seeks relief or the violation of any law claimed to have been committed by the defendant, and the prayer of the complaint shall pray for the relief to which the complainant claims the complainant is entitled."

ORS 756.500(3).

Giving the text of ORS 756.500(1) a common-sense reading, taking into account the statutory definition of "person," the provision embraces a broad set of complaints. It authorizes any individual or organization to lodge a complaint with the PUC against any individual or organization "whose business or activities are regulated" by one or more of the statutes that the PUC is charged with executing or enforcing. Read that way, PGE's complaint in this case fits comfortably within ORS 756.500(1). PGE and all petitioners fall within the definition of "person" contained in ORS 756.010(7).

Moreover, petitioners' "activities" as QFs are regulated "by some one or more of the statutes, jurisdiction for the enforcement or regulation of which is conferred upon the commission." *See* ORS 756.500(1). ORS 758.535, among other things, directs the PUC to set the minimum criteria that must be met to be a QF, to set the terms and conditions for a public utility's purchase for energy from a QF, and to set safety and operating requirements for QFs:

"(1)   The Public Utility Commission shall establish minimum criteria that a cogeneration facility or small power production facility must meet to qualify as a qualifying facility under ORS 543.610, 757.005 and 758.505 to 758.555.

"(2)   The terms and conditions for the purchase of energy or energy and capacity from a qualifying facility shall:

"(a)   Be established by rule by the commission if the purchase is by a public utility;

"(b)   Be adopted by an electric cooperative or people's utility district according to the applicable provision of ORS chapter 62 or 261; and

"(c)   Be established by a municipal utility according to the requirements of the municipality's charter and ordinance.

"(3)   The rules or policies adopted under subsection (2) of this section also shall:

"(a)   Establish safety and operating requirements necessary to adequately protect all systems, facilities and equipment of the electric utility and qualifying facility;

"(b)   Be consistent with applicable standards required by the [PURPA]; and

"(c)   Be made available to the public at the commission's office."

ORS 758.535. As the United States District Court for the District of Oregon reasoned—and we agree with the court's reasoning—this means that PGE's complaint is within the jurisdiction granted to the PUC by the legislature:

"Further, although PURPA is silent as to whether the state agencies are empowered to interpret executed PPAs, Oregon law has placed such disputes within the PUC's statutory authority. The plain text of ORS 756.500 places no clear limits on the kinds of complaints that may be filed before the PUC. Paragraph three provides that '[t]he complaint shall state all grounds of complaint on which the complainant seeks relief *or the violation of any law* claimed to have been committed by the defendant.' ORS 756.500(3) (emphasis added). This phrasing indicates that the PUC

is not limited to hearing claims based on violations of statutes, regulations or commission orders, but can also hear complaints based on other grounds, such as contract claims."

*Alfalfa Solar I LLC*, 2018 WL 2452947 at *6.

Opposing that conclusion, petitioners argue that the complaint procedure does not apply to the complaint against them because "the complaint here was filed against [petitioners], not a regulated public utility, and it concerns a matter that is not subject to the PUC's ongoing regulation." They assert that, under federal law, the PUC cannot "lawfully" regulate the activities of QFs and, from that assertion, assert that "ORS 756.500(1) does not authorize a complaint 'against' [petitioners] here because their PURPA power purchase agreements are not the type of 'business or activities' that may be lawfully 'regulated' by the PUC." (Quoting ORS 756.500(1).)

That argument fails to engage with the plain text of ORS 756.500(1). Contrary to the implications of petitioners' argument, nothing in the text limits its application to complaints against public utilities or entities subject only to "ongoing" regulation by the PUC. Instead, it expressly authorizes complaints against "any person," and does not limit the complaint procedure to complaints against public utilities. If the legislature intended the complaint procedure described in ORS 756.500(1) to apply only to complaints against public utilities, then it would have used the phrase "public utility," as it did in other provisions that apply only to public utilities. ORS 756.500(5), for example, describes a complaint process that may be initiated only by "any public utility or telecommunications utility." As to the argument that regulation must be "ongoing" for the ORS 756.500(1) process to apply, that, too, is not a limitation imposed by the legislature within the text of ORS 756.500(1). It is not our role to add limitations that the legislature did not itself include. ORS 174.010; *Tarr v. Multnomah County*, 306 Or App 26, 35, 473 P3d 603 (2020), *rev den*, 367 Or 496 (2021) ("But rewriting statutes 'to insert what has been omitted' falls outside of 'the office of the judge.' ORS 174.010. For that reason, we may not do it under the cloak of interpretation.").

Petitioners also argue that questions of contract interpretation, including interpretation of utility contracts, are ones that fall within the jurisdiction of the circuit courts. They cite, for example, our statement in *OTECC v. Co-Gen*, 168 Or App 466, 473, 7 P3d 594 (2000), *rev den*, 332 Or 137 (2001), that "the determination of parties' rights under a contract is a common-law issue that falls within a circuit court's general jurisdiction." But the fact that a circuit court would have jurisdiction to resolve the parties' dispute is not a basis for inferring that the PUC lacks jurisdiction under ORS 756.500. As we recognized in *OTECC*, a court and an agency *both* may have jurisdiction over a particular dispute: "[E]ven though an agency's jurisdiction over an issue may not be exclusive, it still may be primary. That is, the agency may be entitled to decide the issue first." *Id*. at 474 & n 6 (internal citation omitted). Said another way, whether ORS 756.500(1) gave the PUC the authority to resolve PGE's complaint turns on the scope of authority granted under the terms of the statute. It does not hinge on whether the dispute would also fall within the subject matter jurisdiction of a court.

Relatedly, petitioners argue that the PUC does not have authority under the statute to regulate PPAs once they are fully executed. From that, they ask us to infer that PGE's complaint is beyond the scope of ORS 756.500(1). But, even were we to accept the premise of that argument, we do not see how that means that PGE's complaint falls outside the scope of the plain terms of ORS 756.500(1). The QFs undisputedly are persons "whose business or activities are regulated by some one or more of the statutes, jurisdiction for the enforcement or regulation of which is conferred upon the commission," and, as PGE and the PUC point out, the complaint concerns the QFs' activities of entering into PPAs with PGE. The standard terms of those PPAs were formally approved by the PUC and PGE's complaint simply asks the PUC to give an interpretation of terms that the PUC itself approved; it does not ask for the contracts to be modified in any way. In fact, given the role granted to the PUC in setting the terms and conditions of PPAs between public utilities and QFs, it would be somewhat anomalous to think that the legislature intended to prohibit the PUC

from determining the meaning of the PPA terms that the PUC itself approved, something that also supports reading ORS 756.500(1) to encompass PGE's complaint. In the face of a broadly worded provision like ORS 756.500(1), if the legislature intended to limit the PUC's authority to resolve disputes about the meaning of agreements that the PUC has the obligation to set terms and conditions for, then the legislature likely would have stated that intention explicitly.

Finally, to the extent that petitioners argue that any post-PPA-execution regulation of QFs by the PUC is not lawful, that argument is not one that addresses the meaning of ORS 756.500(1), and the scope of the PUC complaint process authorized by the legislature. Rather, it appears at first blush to be an argument that federal law displaces or preempts the PUC's statutory authority under state law to resolve complaints like PGE's, but petitioners have not developed a preemption argument before us, and, in their reply brief, they have disclaimed making any preemption argument.

For the foregoing reasons, we conclude that, under the plain terms of ORS 756.500(1), the PUC had the authority to resolve PGE's complaint about the interpretation of the parties' PPAs. In light of that conclusion, we do not resolve the parties' other arguments regarding potential sources of authority for the PUC to resolve the parties' dispute.

*Interpretation.* Having concluded that the PUC had the statutory authority to resolve the parties' dispute about the meaning of the PPA, we turn to the question of whether the PUC correctly resolved that dispute. As noted, at issue is whether, under the relevant PPAs, the 15-year period during which the QFs are entitled to a fixed price for the power delivered starts to run on the date of contract execution or, instead, on the date a QF first delivers power. That presents a question of law, and our review is for errors of law. ORS 183.482(8).

As the parties more or less agree, we interpret the PPAs under the framework established in *Yogman v.*

*Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997).[2] Under that framework, we look at the text of the relevant provisions in the context of the entire agreement. If the meaning is clear from that examination, our analysis ends. *Id*. If not, we proceed to examine extrinsic evidence of the parties' intent and, if that examination fails to resolve the ambiguity, then we turn to maxims of construction. *Id*. at 363-64.

In this instance, we are persuaded that the PUC correctly determined that the terms of the PPA unambiguously resolve the question in favor of PGE under the *Yogman* framework. Schedule 201, included in the PPAs at issue, provides that "[a] Seller must execute a PPA with the Company prior to delivery of power to the Company. The agreement will have a term of up to 20 years as selected by the QF." It provides that the "Standard Fixed Price Option * * * is available for a maximum term of 15 years." It provides further that "Sellers with PPAs exceeding 15 years will receive pricing equal to the Mid-C Index Price * * * for all years up to five in excess of the Initial 15." Section 2.1 of the PPA provides that "[t]his Agreement shall become effective upon execution by both Parties ('Effective Date')" and section 1.38 provides that "'[t]erm' shall mean the period beginning on the Effective Date and ending on the Termination Date." Section 4.1 of the PPA states, "Commencing on the Effective Date and continuing through the Term of this agreement, Seller shall sell to PGE the entire Net Output delivered from the Facility at the Point of Delivery."

Taken together, those provisions unambiguously provide that a PPA between PGE and a QF (1) can have a term extending from one to 20 years; (2) any such term starts on the date of contract execution; (3) the fixed price option is available only for the first 15 years of that term starting on the effective date of contract execution; and (4) for a contract with a term that is longer than 15 years, the fixed price is available only for the first 15 years of the term.

---

[2] PGE asserts that we should defer to the PUC's interpretation of the provisions at issue. Because we conclude that the meaning of those provisions is unambiguous and consistent with the PUC's interpretation of them, we do not decide whether the PUC's interpretation of standard PPA terms that it has approved would be entitled to deference in the face of an ambiguity.

In arguing that the contract is ambiguous, petitioners point to section 4.5 of the contract. That provision specifies, in relevant part, "During the Renewable Resource Sufficiency Period, and any period within the Term of this Agreement after completion of the first (15) years after the Commercial Operation Date, Seller shall retain all Environmental Attributes in accordance with the Schedule." Petitioners argue that that makes it plausible to construe the price provisions of the PPAs to mean that they are entitled to the fixed price under the contract for a 15-year period starting from their commercial operation dates, rather than the date of contract execution.

But as the PUC explained, section 4.5 "was drafted separately and well after the terms governing the availability of fixed prices that were initially set in 2005" by way of a PUC order in a compliance filing. For that reason alone, it does not appear to be probative of the parties' intentions regarding the start date of the 15-year fixed price term. To the extent that it may be, we agree with the PUC's analysis as to why it does not create an ambiguity:

> "Section 4.5 does not speak to fixed price availability and does not indicate when fixed prices are available. The controlling fixed price terms are found in Schedule 201. The fact that the date of contract execution and commercial operation date may or may not align as it relates to Schedule 201 and Section 4.5 with respect to the availability of environmental attributes does not create ambiguity with respect to the availability of fixed prices starting at contract execution."

Accordingly, we reject petitioners' contention that the PUC erred in determining that the fixed price term of the PPAs at issue started on the date of contract execution.

Affirmed.